**FAIRFIELD INSURANCE COMPANY, Appellant,**

v.

**STEPHENS MARTIN PAVING, LP; Carrie Bennett, Individually and as Representative of the Estate of Roy Edward Bennett, Deceased, and as Next Friend of Lane Edward Bennett, Cody Lee Bennett, and April Anne Bennett, Minors, Appellees.**

No. 04–0728.

Supreme Court of Texas.

Argued Nov. 9, 2004.

Decided Feb. 15, 2008.

654

David M. Pruessner, Jes Alexander, The Law Offices of David M. Pruessner, Dallas TX, for appellant.

Charles C. Self III, Whitten & Young, P.C., Abilene TX, for appellee.

Michael R. Cooper, Salado TX, for Intervenor.

Wade Caven Crosnoe, Thompson Coe Cousins & Irons, L.L.P., Austin, TX, G. Andrew Veazey, Huval Veazey Felder & Aertker, LLC, Lafayette, LA, Macey Reasoner Stokes, Baker & Botts L.L.P., Robert M. Roach Jr., Cook & Roach, L.L.P., Houston, Robert D. Allen, Meckler Bulger & Tilson LLP, Dallas, Kathleen Hopkins Alsina, Phelps Dunbar, L.L.P., Houston, P.M. Schenkkan, Graves Dougherty Hearon & Moody, P.C., Austin, Fred A. Simpson, Jackson Walker L.L.P., Randall L. Smith, Houston, E. Thomas Bishop, Bishop & Hummert, P.C., Dallas, Mark L. Kincaid, Kincaid, Horton & Smith, Austin, TX, for Amicus Curiae.

Justice WAINWRIGHT delivered the opinion of the Court, joined by Chief Justice JEFFERSON, Justice HECHT, Justice O'NEILL, Justice BRISTER, Justice MEDINA, Justice GREEN, and Justice WILLETT, and by Justice JOHNSON as to sections I, II, and IV only.

■ This case is before the Court on a certified question from the United States Court of Appeals for the Fifth Circuit: "Does Texas public policy prohibit a liability insurance provider from indemnifying an award for punitive damages imposed on its insured because of gross negligence?" *Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 381 F.3d 435, 437 (5th Cir.2004). Pursuant to article V, section 3–c of the Texas Constitution and rule 58.1 of the Texas Rules of Appellate Procedure, we answer that Texas public policy does not prohibit coverage under the type of workers' compensation and employer's liability insurance policy at issue in this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Stephens Martin Paving, a highway paving company, employed Roy Edward Bennett as a brooming machine operator. On December 20, 2002, Bennett died as a result of injuries that occurred when a brooming machine rolled over. Stephens Martin Paving carried a workers' compensation and employer's liability insurance policy, issued by Fairfield Insurance Company. Fairfield paid workers' compensation benefits to Bennett's wife and children under the policy in accordance with Texas workers' compensation law.

On January 24, 2003, Bennett's survivors sued Stephens Martin Paving for gross negligence, seeking exemplary damages because Stephens Martin Paving allegedly failed to provide a safe place to work,

failed to follow and enforce OSHA safety rules and regulations, and failed to properly train and supervise its employees. Having received workers' compensation benefits, Bennett's survivors are barred by statute from recovering actual damages and seek only exemplary damages in the suit.[1]

On February 24, 2003, Fairfield sued Stephens Martin Paving and Bennett's survivors in federal district court, seeking a declaratory judgment that Fairfield owed no duty to defend or indemnify Stephens Martin Paving in the suit for exemplary damages. Relying on *Ridgway v. Gulf Life Insurance Co.*, 578 F.2d 1026, 1029 (5th Cir.1978), the federal district court concluded that the language in Fairfield's policy covers exemplary damages and that Texas public policy does not prohibit insurance coverage of those damages. The court denied Fairfield's motion for summary judgment and entered a judgment declaring that Fairfield has a duty to defend Stephens Martin Paving and a duty to indemnify Stephens Martin Paving as provided by the policy if Stephens Martin Paving is adjudicated responsible for the damages sought in the underlying suit brought by Bennett's survivors (either by judgment or settlement). Fairfield appealed, and the Fifth Circuit certified to this Court the question of the insurability of exemplary damages for gross negligence. *Fairfield Ins. Co.*, 381 F.3d at 437; Tex.R.App. P. 58.1.

## II. COVERAGE OF EXEMPLARY DAMAGES FOR GROSS NEGLIGENCE

Determining whether exemplary damages for gross negligence are insurable requires a two-step analysis. *See, e.g., Grinnell Mut. Reinsurance Co. v. Jungling*, 654 N.W.2d 530, 535–37 (Iowa 2002); *Fluke Corp. v. Hartford Accident & Indem. Co.*, 145 Wash.2d 137, 34 P.3d 809, 814 (Wash.2001); *Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677, 685 (1985). First, we decide whether the plain language of the policy covers the exemplary damages sought in the underlying suit against the insured.

Second, if we conclude that the policy provides coverage, we determine whether the public policy of Texas allows or prohibits coverage in the circumstances of the underlying suit. We first look to express statutory provisions regarding the insurability of exemplary damages to determine whether the Legislature has made a policy decision. *See Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 628 (Tex.2004) ("Generally, 'the State's public policy is reflected in its statutes.'") (quoting *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 250 (Tex. 2002)); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex.2000). If the Legislature has not made an explicit policy decision, we then consider the general public policies of Texas.

### A. POLICY LANGUAGE

The policy Fairfield issued to Stephens Martin Paving contains two types of insurance: workers' compensation insurance and employer's liability insurance. Under the workers' compensation part of the policy, Fairfield agrees to pay the benefits that Stephens Martin Paving is required to pay by Texas workers' compensation law

---

1. Generally, an employer who purchases workers' compensation insurance is protected from an employee's common law claims for injuries occurring during the course and scope of the employee's work responsibilities. Tex. Lab.Code § 408.001. However, this exclusive remedy doctrine does not prohibit recovery of exemplary damages if the employee's death is caused by the employer's gross negligence. *Id.* § 408.001(b)-(c).

and other enumerated costs. In this case, the parties agree that the policy covers the workers' compensation benefits paid to the Bennetts. The workers' compensation part of the policy makes the employer responsible for "any payments in excess of the benefits regularly provided by the workers compensation law including those required because: 1. of your serious and willful misconduct; ... 3. you fail to comply with a health or safety law or regulation."

Under the employer's liability part of the policy, Fairfield agrees to pay "all sums [Stephens Martin Paving] legally must pay as damages because of bodily injury to [its] employees, provided the bodily injury is covered by this Employers Liability Insurance" and other specific costs. It excludes coverage of "punitive or exemplary damages because of bodily injury to an employee employed in violation of law." An endorsement to the policy adds that "[t]his exclusion does not apply unless the violation of law caused or contributed to the bodily injury." The policy also excludes damages arising from injuries caused by intentional acts.

The Bennetts' claim against Stephens Martin Paving seeks only exemplary damages for gross negligence. Therefore, the coverage issue in this case concerns only the employer's liability part of the policy and not the part of the policy regarding workers' compensation benefits. Because the Fifth Circuit's question is directed only at the public policy of Texas, we limit our discussion to the second prong of the analysis and presume that the policy language covers the exemplary damages sought.

## B. TEXAS STATUTORY PROHIBITIONS

When considering whether public policy should prohibit the coverage of exemplary damages in a particular case, courts should study the contexts in which the Legislature has spoken. In a few instances, the Legislature has expressly prohibited or otherwise limited the availability of such insurance.

*Health Care Providers:* Article 5.15–1, section 8 of the Texas Insurance Code prohibits insurance coverage of exemplary damages assessed against health care providers and physicians, creating an exception for a subset of healthcare providers including hospitals, nursing homes, and assisted living facilities:

No policy of medical professional liability insurance issued to or renewed for a health care provider or physician in this state may include coverage for exemplary damages that may be assessed against the health care provider or physician; provided, however, that the commissioner may approve an endorsement form that provides for coverage for exemplary damages to be used on a policy of medical professional liability insurance issued to a hospital, as the term "hospital" is defined in this article, or to a for-profit or not-for-profit nursing home or assisted living facility.

TEX. INS.CODE art. 5.15–1, § 8.[2]

*Guaranty Funds and Excess Liability Pools:* The Legislature has explicitly ex-

---

**2.** As part of the Medical Liability Insurance Improvement Act of Texas, passed in 1977, the Legislature prohibited "health care providers" from obtaining insurance coverage of exemplary damages in Texas. Act of May 30, 1977, 65th Leg., R.S., ch. 817, Part 3, § 8, 1977 Tex. Gen. Laws 2039, 2055–56. "Health care provider" was defined as:

any person, partnership, professional association, corporation, facility, or institution licensed or chartered by the State of Texas to provide health care as a registered nurse, hospital, dentist, podiatrist, chiropractor, optometrist, blood bank that is a nonprofit corporation chartered to operate a blood bank and which is accredited by the Ameri-

cluded risk management and excess insurance pools for various public entities [3] from paying exemplary damages.[4] In 1989, the Legislature amended the Texas Property and Casualty Insurance Guaranty Act to exclude from the definition of "covered claims" against insolvent insurers "any punitive, exemplary, extracontractual, or bad

faith damages awarded in a court judgment against an insured or insurer." [5] The Legislature has included the same prohibition for several other such entities covering exceptional risks.[6] In each instance the Legislature's concern appears to have been for the financial impact on these entities of insurance for exemplary

can Association of Blood Banks, or not-for-profit nursing home, or an officer, employee, or agent of any of them acting in the course and scope of his employment.
Act of May 30, 1977, 65th Leg., R.S., ch. 817, Part 3, § 2(2), 1977 Tex. Gen. Laws 2039, 2055. Later amendments redefined health care providers and expressly allowed providers to obtain insurance coverage of exemplary damages through an approved policy endorsement. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 7.01, 1987 Tex. Gen. Laws 1, 35–36 (allowing an endorsement for hospitals); Act of May 21, 1997, 75th Leg., R.S., ch. 746, § 1, 1997 Tex. Gen. Laws 2451, 2451 (allowing an endorsement for not-for-profit nursing homes); Act of May 27, 2001, 77th Leg., R.S., ch. 1284, § 5.02, 2001 Tex. Gen. Laws 3083, 3085 (requiring an endorsement for for-profit nursing homes); Act of May 14, 2003, 78th Leg., R.S., ch. 141, § 2, 2003 Tex. Gen. Laws 195, 195 (allowing an endorsement for assisted living facilities).

3. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 5.08, 1987 Tex. Gen. Laws 1, 26 (current version at Tex.Ins.Code §§ 2207.001–.409) (Excess Liability Pool for Counties and Certain Educational Entities); Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 5.09, 1987 Tex. Gen. Laws 1, 31 (current version at Tex. Ins.Code §§ 2208.001–.309) (Texas Public Entity Excess Insurance Pool).

4. Tex. Ins.Code § 2207.353(c) ("Money in the [Excess Liability Fund for Counties and Certain Educational Entities] may not be used to pay: (1)punitive damages ...."); id. § 2208.252(b) ("Money in the [Texas Public Entity Excess Insurance Fund] may not be used to pay: (1) punitive damages ...."); id. § 2208.303 ("Excess insurance coverage provided by the [Texas Public Entity Excess Insurance Pool] may not include coverage for punitive damages.").

5. Act of May 29, 1989, 71st Leg., R.S., ch. 1082, § 6.13, 1989 Tex. Gen. Laws 4370,

4395–96 (current version at Tex. Ins.Code § 462.210). See also Act of May 30, 2003, 78th Leg., R.S., ch. 1218, § 2, 2003 Tex. Gen. Laws 3458, 3459 (current version at Tex. Ins. Code § 462.302(c)(2)) ("The [Texas Property and Casualty Insurance Guaranty Association] has no liability for ... claims for ... exemplary damages...."). That Act was first passed in 1971 to protect insolvent property and casualty insurers' policyholders and third-party claimants by authorizing assessments against other Texas insurers to pay "covered claims" against insurers that had become insolvent. Act of May 12, 1971, 62d Leg., R.S., ch. 360, § 1, 1971 Tex. Gen. Laws 1362 (current version at Tex. Ins.Code §§ 462.001–.351).

6. Tex. Ins.Code § 463.204(9) (stating that the Life, Accident, Health, and Hospital Service Insurance Guaranty Association cannot pay punitive or exemplary damages); id. § 2203.154 ("The [Medical Liability Insurance Joint Underwriting Association] may not issue or renew a medical liability insurance policy for a physician or health care provider under this chapter that includes coverage for punitive damages assessed against the physician or health care provider."); id. § 2205.253(b) ("Money in the [Texas Child–Care Facility Liability Fund] may not be used to pay: (1) punitive damages ...."); id. § 2209.253(b) ("Money in the [Texas Nonprofit Organizations Liability Fund] may not be used to pay: (1) punitive damages ...."); id. § 2209.303 ("Liability insurance coverage provided by the [Texas Nonprofit Organizations Liability Pool] may not include coverage for punitive damages."); id. § 2602.255(4) (excluding "exemplary, extracontractual, or bad faith damages awarded against an insured or title insurance company by a court judgment" from "covered claims" against the Texas Title Insurance Guaranty Association).

damages.[7]

The Legislature is aware of and sensitive to issues of insurance coverage of exemplary damages. It has made the policy decision to prohibit insurance coverage of those damages in selected circumstances.

## C. WORKERS' COMPENSATION

This Court has recognized that "the administration of the workers' compensation system is heavily imbued with public policy concerns." *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 553 (Tex.2001), *superseded by statute*, TEX. LAB.CODE § 406.003(e), *as explained in Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex.2004). Because this case arises from a claim for exemplary damages under the Texas Workers' Compensation Act, we review the applicable statutory scheme and accompanying insurance regulation of that field.

In Texas, participation in the workers' compensation system is optional for employers and employees. However, if the employer purchases workers' compensation insurance, the employer must adhere to the statutory and regulatory guidelines of the Workers' Compensation Act. Among these requirements is the legislative directive that only workers' compensation policies approved by the Texas Department of Insurance are available in Texas.[8]

TEX. INS.CODE art. 5.56.[9] These policies provide broad coverage for an employee's injuries. In exchange for fulfilling the Act's requirements, the Act protects an employer from an employee's common law claims for injuries or death occurring during the course and scope of the employee's work responsibilities, except those claims involving the death of an employee caused by an employer's intentional or grossly negligent conduct. TEX. LAB.CODE § 408.001. An employee who does not "opt out" of the workers' compensation system waives claims not provided by the Act. *Id.* § 406.034. Thus, workers' compensation insurance provides the exclusive remedy for the injury or death of a participating employee in most cases.

This exclusive remedy does not prohibit recovery of exemplary damages if the employee's death is caused by the employer's gross negligence. *Id.* § 408.001(b)-(c). Section 408 states:

(a) Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.

(b) This section does not prohibit the recovery of exemplary damages by the

---

7. The Legislature also requires commercial liability insurers to file closed claim reports including, among much other information, "amounts paid for punitive damages." TEX. INS.CODE § 38.154(a)(3)(C)(x). At a minimum, this suggests that the Legislature is aware that insurers are making some payments for punitive damages and has not broadly prohibited those payments.

8. Before 1991, the Texas Department of Insurance (TDI) was known as the State Board of Insurance. Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 1.01, 1991 Tex. Gen. Laws 939, 939; *see also* Act of May 30, 1993, 73rd Leg., R.S., ch. 685, § 1.01, 1993 Tex. Gen. Laws 2559, 2559 (specifying that "a reference in [all statutes involving insurance] to the State Board of Insurance means [TDI]").

9. In 2005, the Legislature renumbered and codified Article 5.56 and other articles into sections of the Texas Insurance Code. Act of May 24, 2005, 79th Leg. R.S., ch. 727, §§ 2, 18(a)(4). We cite to the version applicable to the underlying suit in this case. TEX. INS.CODE art. 5.56 (*added by* Act of June 7, 1951, 52d Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 945).

surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.

(c) In this section, "gross negligence" has the meaning assigned by Section 41.001, Civil Practice and Remedies Code.

The Bennetts bring this claim for exemplary damages only under Subsections 408(b) and (c), arguing that Stephens Martin Paving's gross negligence caused Bennett's death.

TDI is authorized to adopt rules "governing hearings and other proceedings necessary for the promulgation or approval of rates[,] ... policy forms[,] or policy form endorsements." TEX. INS.CODE art. 1.33C. Article 5.56 of the Insurance Code provides that TDI "shall prescribe standard policy forms to be used by all companies or associations writing workmen's compensation insurance in this State" and prohibits organizations from using policy forms "other than those made, established and promulgated and prescribed by [TDI]," except as specifically provided by the statute.[10] By Article 5.62, the Legislature "empowered [TDI] to make and enforce all such reasonable rules and regulations not inconsistent with the provisions of this subchapter as are necessary to carry out its provisions." TEX. INS.CODE art. 5.62.

Under the authority delegated to TDI from the Legislature, TDI approves standard workers' compensation insurance policies and endorsements. *See* Texas Workers' Compensation Commission and Employers' Liability Manual, available at http://www.tdi.state.tx.us/wc/regulation/ index.html# manual. As previously discussed, the policy provides two types of insurance coverage—workers' compensation insurance and employers' liability insurance. The workers' compensation part of the policy only provides coverage for benefits required by workers' compensation law and other enumerated costs, excluding punitive damages. If, under Section 408.001, workers' compensation insurance provides the exclusive remedy for an injured employee who is participating in the system, then why would the TDI-approved, standard policy—the only policy workers' compensation insurers may use—provide any additional liability insurance to employers? The statutory scheme and TDI's execution of the scheme reveal an intent to provide additional insurance coverage— coverage for an employer's gross negligence.[11] Although Section 408.001 allows an employee to pursue a claim for exemplary damages against an employer for intentional acts, the insurance policy here excludes coverage for such intentional acts. Thus, the "all sums" language in the employer's liability part of this TDI-approved, dual coverage policy covers

**10.** Organizations may "use any form of endorsement appropriate to its plan of operation, if such endorsement [is] first submitted to and approved by the Board." TEX. INS.CODE art. 5.57.

**11.** The TDI policy does not provide coverage of "punitive or exemplary damages because of bodily injury to an employee employed in violation of law," nor does it cover these damages arising from injuries caused by intentional acts. An endorsement to the policy

adds that "[t]his exclusion does not apply unless the violation of law caused or contributed to the bodily injury." We note that Bennett's petition alleges that Stephens Martin Paving failed to follow and enforce safety rules and regulations and OSHA rules and regulations. Because we do not have a complete record and we limit our discussion to the Fifth Circuit's certified question, we do not address whether these allegations trigger the exclusion.

some of the common law claims excluded from the workers' compensation part of the policy, but it does not cover claims based on intentional acts. Under TDI's policy, a participating employer would have coverage for workers' compensation claims and claims based on gross negligence. The Legislature's expressed intent is that Texas public policy does not prohibit insurance coverage for claims of gross negligence in this context.

## III. PUBLIC POLICY CONSIDERATIONS

Although the Legislature's expressed direction ends our inquiry in the present case, we recognize that the Fifth Circuit framed its certified question as a broad inquiry about Texas public policy and the coverage of exemplary damages. We hesitate to opine on policy language and fact situations not before us, but also recognize the import of this issue and therefore discuss some of the considerations relevant to determining whether Texas public policy prohibits insurance coverage of exemplary damages in other contexts in the absence of a clear legislative policy decision.

### A. SUMMARY OF THE DEBATE

Although determining whether public policy prohibits the insurance coverage of

exemplary damages for gross negligence in Texas is a novel question for this Court, the issue is no stranger to the United States' legal community. Christopher A. Wilson, Lazenby *after* Hodges—*Insurability of Punitive Damage Awards in Tennessee: A Continuing Question of Public Policy,* 36 U. MEM. L.REV. 463 (2006); Stephanie L. Grassia, *The Insurability of Punitive Damages in Washington: Should Insureds Who Engage in Intentional Misconduct Reap the Benefit of Their "Bargains?,"* 26 SEATTLE U.L.REV. 627 (2003); Lorelie S. Masters, *Punitive Damages: Covered or Not?,* 55 BUS. LAW. 283 (1999); Michael A. Rosenhouse, Annotation, *Liability Insurance Coverage as Extending to Liability for Punitive or Exemplary Damages,* 16 A.L.R.4th 11 (1982).

For over forty years, courts, legislatures, and scholars nationwide have struggled with this issue. Of the forty-five states in which the highest court of the state or the legislature has addressed the insurability of exemplary damages in some fashion, twenty-five have established generally that their public policy does not prohibit coverage, sometimes including or excluding the uninsured motorist or vicarious liability contexts.[12] Eight states have

---

12. HAW.REV.STAT. § 431:10–240 (2007) ("Coverage under any policy of insurance issued in this State shall not be construed to provide coverage for punitive or exemplary damages unless specifically included."); MONT.CODE ANN. § 33–15–317 (2007) ("Insurance coverage does not extend to punitive or exemplary damages unless expressly included by the contract of insurance."); NEV.REV.STAT. § 681A.095 (2007) ("An insurer may insure against legal liability for exemplary damages or punitive damages that do not arise from a wrongful act of the insured committed with the intent to cause injury to another."); VA. CODE ANN. § 38.2–227 (2007) ("It is not against the public policy of the Commonwealth for any person to purchase insurance providing coverage for punitive damages aris-

ing out of the death or injury of any person as the result of negligence, including willful and wanton negligence, but excluding intentional acts."); *Montgomery Health Care Facility, Inc. v. Ballard,* 565 So.2d 221, 226 (Ala.1990) (wrongful death case); *State Farm Mut. Auto. Ins. Co. v. Lawrence,* 26 P.3d 1074, 1080 (Alaska 2001); *State Farm Mut. Auto. Ins. Co. v. Wilson,* 162 Ariz. 251, 782 P.2d 727, 729–36 (1989); *Cal. Union Ins. Co. v. Ark. La. Gas Co.,* 264 Ark. 449, 453, 572 S.W.2d 393, 395 (1978) (citing *So. Farm Bureau Cas. Ins. Co. v. Daniel,* 246 Ark. 849, 440 S.W.2d 582 (1969)); *Jones v. State Farm Mut. Auto. Ins. Co.,* 610 A.2d 1352, 1354 (Del.1992); *Roman v. Terrell,* 195 Ga.App. 219, 393 S.E.2d 83, 86 (1990), *aff'd by, State Farm Mut. Auto. Ins. Co. v. Weathers,* 260 Ga. 123, 392 S.E.2d 1 (1990);

adopted a broad prohibition against insuring exemplary damages.[13] Seven states allow insurance coverage of exemplary damages only in the vicarious liability context, prohibiting the practice otherwise.[14] Three states allow insurance coverage of exemplary damages in the uninsured motorist context, but have not directly spoken outside this context.[15] Two other states

*Abbie Uriguen Oldsmobile Buick, Inc. v. U.S. Fire Ins. Co.*, 95 Idaho 501, 511 P.2d 783, 789–91 (Idaho 1973); *Grinnell*, 654 N.W.2d at 540–41 (citing *Skyline Harvestore Sys., Inc. v. Centennial Ins. Co.*, 331 N.W.2d 106, 109 (Iowa 1983)); *Ky. Cent. Ins. Co. v. Schneider*, 15 S.W.3d 373, 376 (Ky.2000) (citing *Cont'l Ins. Cos. v. Hancock*, 507 S.W.2d 146 (Ky. 1973)); *First Nat'l Bank of St. Mary's v. Fid. & Deposit Co.*, 283 Md. 228, 389 A.2d 359, 364–67 (1978); *Shelter Mut. Ins. Co. v. Dale*, 914 So.2d 698, 703 (Miss.2005); *Mazza v. Med. Mut. Ins. Co. of N.C.*, 311 N.C. 621, 319 S.E.2d 217, 220–22 (1984) (negligent medical malpractice); *MacKinnon v. Hanover Ins. Co.*, 124 N.H. 456, 471 A.2d 1166, 1168 (1984) (holding that public policy does not prohibit homeowner's insurance policy from covering liability arising from intentional tort of battery and negligent infliction of emotional distress); *Cont'l Cas. Co. v. Kinsey*, 499 N.W.2d 574, 581 (N.D.1993) (requiring insurer to indemnify insured for punitive damages award according to insurance policy, but allowing insurer to seek reimbursement from insured because contracting away responsibility for "willful fraud and deceit" violated state statute); *Harrell v. Travelers Indem. Co.*, 279 Or. 199, 567 P.2d 1013, 1021 (1977); *S.C. State Budget & Control Bd. v. Prince*, 304 S.C. 241, 403 S.E.2d 643, 648 (1991) (holding insurer could not deny coverage for punitive damages "in the name of the public policy when the language of its own policy specifically provides such coverage," but failing to explain why); *State v. Glens Falls Ins. Co.*, 137 Vt. 313, 404 A.2d 101, 105 (1979); *Fluke*, 34 P.3d at 815; *Loveridge v. Chartier*, 161 Wis.2d 150, 468 N.W.2d 146, 159 (1991); *State ex rel. State Auto Ins. Co. v. Risovich*, 204 W.Va. 87, 511 S.E.2d 498, 505 (1998); *Sinclair Oil Corp. v. Columbia Cas. Co.*, 682 P.2d 975, 981 (Wyo.1984).

13. Ohio Rev.Code Ann. § 3937.182(B) (2008) (prohibiting coverage for punitive and exemplary damages in automobile policies and certain types of casualty and liability policies); Utah Code Ann. § 31A–20–101(4) (2007) ("No insurer may insure or attempt to insure against ... punitive damages."); *PPG Indus. v. Transamerica Ins. Co.*, 20 Cal.4th 310, 84 Cal.Rptr.2d 455, 975 P.2d 652, 657 (1999); *Lira v. Shelter Ins. Co.*, 913 P.2d 514, 517 (Colo.1996); *Bernier v. Burris*, 113 Ill.2d 219, 100 Ill.Dec. 585, 497 N.E.2d 763, 776 (1986) (citing *Beaver v. Country Mut. Ins. Co.*, 95 Ill.App.3d 1122, 51 Ill.Dec. 500, 420 N.E.2d 1058, 1060–61 (1981)) (in dicta); *Biondi v. Beekman Hill House Apartment Corp.*, 94 N.Y.2d 659, 709 N.Y.S.2d 861, 731 N.E.2d 577, 579 (2000); *Town of Cumberland v. R.I. Interlocal Risk Mgmt. Trust, Inc.*, 860 A.2d 1210, 1219 n. 14 (R.I.2004); *City of Fort Pierre v. United Fire & Cas. Co.*, 463 N.W.2d 845, 848 (S.D.1990).

14. Kan. Stat. Ann. § 40–2,115(a) (2006) ("It is not against the public policy of this state for a person or entity to obtain insurance covering liability for punitive or exemplary damages assessed against such insured as the result of acts or omissions, intentional or otherwise, of such insured's employees, agents or servants, or of any other person or entity for whose acts such insured shall be vicariously liable, without the actual prior knowledge of such insured."); *Bodner v. United Servs. Auto. Ass'n*, 222 Conn. 480, 610 A.2d 1212, 1221–22 (1992); *U.S. Concrete Pipe Co. v. Bould*, 437 So.2d 1061, 1064 (Fla.1983); *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 216 (Minn.1984);; *Malanga v. Mfgs. Cas. Ins. Co.*, 28 N.J. 220, 146 A.2d 105, 108–10 (1958); *Aetna Cas. & Sur. Co. v. Craig*, 771 P.2d 212, 215–16 (Okla.1989); *Esmond v. Liscio*, 209 Pa.Super. 200, 224 A.2d 793, 800 (Pa.1966).

15. *Sharp v. Daigre*, 555 So.2d 1361, 1364 (La.1990) (mentioning but not applying broad rule to general liability insurance); *Jaramillo v. Providence Wash. Ins. Co.*, 117 N.M. 337, 871 P.2d 1343, 1351–52 (1994); *Carr v. Ford*, 833 S.W.2d 68, 71 (Tenn.1992) (holding uninsured motorist statute permits but does not require coverage for punitive damages); *Lazenby v. Universal Underwriters Ins. Co.*, 214 Tenn. 639, 383 S.W.2d 1 (1964). *But see West v. Pratt*, 871 S.W.2d 477, 479 (Tenn.1994) (stating in dicta that a "clear public policy exists in Tennessee that strongly disfavors the payment of punitive damages by uninsured motorist carriers to their insureds").

have precluded insurance coverage of exemplary damages in the uninsured motorist context, but have not otherwise directly spoken on the issue.[16] Finally, the insurability of exemplary damages resulting from acts akin to gross negligence has not been addressed by the highest court or legislature in Indiana, Michigan, Missouri, and Texas.[17] Thus, the majority of states that have considered whether public policy prohibits insurance coverage of exemplary damages for gross negligence, either by legislation or under the common law, have decided that it does not.

Two key cases, decided over forty years ago, continue to illustrate the opposing viewpoints on the insurability of exemplary damages: *Northwestern National Cas. Co. v. McNulty*, 307 F.2d 432 (5th Cir.1962), and *Lazenby v. Universal Underwriters Insurance Co.*, 214 Tenn. 639, 383 S.W.2d 1 (1964). In *McNulty*, a drunk driver seriously injured another motorist in Florida. 307 F.2d at 433. The injured motorist sued for compensatory and punitive damages, securing a verdict for $57,500: $37,500 in compensatory damages and $20,000 in punitive damages. *Id.* The drunk driver's insurance policy provided $50,000 in coverage. *Id.* The insurer argued that only the compensatory part of the verdict was covered by the policy. *Id.* The court agreed, holding that Florida public policy prohibited the insurability of punitive damages. *Id.* at 434.

Key to the court's reasoning was its conclusion that Florida law characterized "punitive damages as a penalty, imposed as a means of punishing the defendant in order to deter him and others from antisocial conduct, and to no significant extent compensation." *Id.* at 436. The court relied heavily on the different functions of punitive and compensatory damages in different states' schemes:

> The crucial distinction ... is the different function served by compensatory and punitive damages. In a system of law basing recovery of damages on the defendant's culpability, compensatory liability, while it may discourage negligent conduct as a side effect, is primarily designed to shift a loss from a wholly innocent party to one whose fault is responsible for causing the loss, although in many cases the fault of the responsible party may not have been so blameworthy that he would have been punished criminally if the fault had not caused an accident. The rationale of compensatory damages is not so much a policy that the responsible party should pay; it is more a policy that the wholly innocent party should not pay. Insurance against compensatory liability therefore does not frustrate the reason for imposing the liability. But in a case involving the determination that punitive damages are insurable the public policy considerations are broader and more important.

*Id.* at 438. The court concluded that allowing a wrongdoer "to insure himself against punishment" would result in "a freedom of misconduct inconsistent with the establishment of sanctions against such

---

16. *Tuttle v. Raymond*, 494 A.2d 1353, 1360 n. 20, 1362 & n. 25 (Me.1985) (citing *Braley v. Berkshire Mut. Ins. Co.*, 440 A.2d 359, 361–62 (Me.1982)); *Santos v. Lumbermens Mut. Cas. Co.*, 408 Mass. 70, 556 N.E.2d 983, 990, 991 n. 17 (1990).

17. Nebraska does not allow recovery of exemplary damages. *Distinctive Printing & Pack-aging Co. v. Cox*, 232 Neb. 846, 857, 443 N.W.2d 566 (Neb.1989) (citing NEB. CONST. art. VII, § 5; *Miller v. Kingsley*, 194 Neb. 123, 230 N.W.2d 472, 474 (1975) ("It is a fundamental rule of law in this state that punitive, vindictive, or exemplary damages are not allowed.")).

conduct." *Id.* at 440. However, even the *McNulty* court recognized some exceptions to this rule, suggesting that public policy would not prohibit an employer from obtaining insurance to cover exemplary damage awards arising from the acts of employees. *Id.*

The Supreme Court of Tennessee decided the lead case in support of the insurability of exemplary damages only a few years after the *McNulty* decision. *Lazenby,* 383 S.W.2d 1. Again, the case involved an insurance company's refusal to pay the punitive damages portion of a verdict against a drunk driver. *Id.* at 2. The court recognized that the dominant purpose of exemplary damages in Tennessee was similar to that discussed in *McNulty:* "the interest of society and of the agreed [sic] individual are blended and such damages are allowed as punishment for such conduct and as an example or warning to the one so guilty, and others, in order to deter them from committing like offenses in the future." *Id.* at 4. Despite the similarity of the two courts' characterizations of the purpose of exemplary damages, the Tennessee Supreme Court held that the exemplary damages in that case were insurable. *Id.* at 5.

First, the *Lazenby* court explained that if criminal sanctions "apparently have not deterred this slaughter on our highways and streets," then "the closing of the insurance market, in the payment of punitive damages" would be unlikely to deter such wrongful conduct. *Id.* Second, the expectations of the insured, upon reading the plain language of the insurance policy, was that exemplary damages would be covered absent intentional conduct to injure. *Id.* The court also concluded that the line between "simple negligence and negligence

upon which an award of punitive damages can be made" did not justify a public policy exception for acts otherwise covered by the insurance policy. *Id.* Finally, the court observed that using public policy arguments to partially void a contract that, if construed as written, would protect the insured from both compensatory and punitive damages should not be done "except in a clear case" and concluded that "the reasons advanced do not make such a clear case." *Id.*

These cases outline the primary arguments advanced by the parties in this case and the arguments considered by courts nationwide. We now consider these arguments in light of Texas law.

## B. TEXAS PUBLIC POLICY

In the absence of expressed direction from the Legislature, whether a promise or agreement will be unenforceable on public policy grounds will be determined by weighing the interest in enforcing agreements versus the public policy interest against such enforcement. *See* Restatement (Second) of Contracts § 178(1) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."). On one side of the scale is Texas' general policy favoring freedom of contract. *Lawrence,* 44 S.W.3d at 553. Courts weighing this interest should consider the reasonable expectations of the parties and the value of certainty in enforcement of contracts generally. *See* Restatement (Second) of Contracts § 178(2).[18] On the other side of the scale

---

18. "In weighing the interest in the enforcement of a term, account is taken of (a) the parties' justified expectations, (b) any forfei-

ture that would result if enforcement were denied, and (c) any special public interest in

is the extent to which the agreement frustrates important public policy.[19] *Id.* § 178 cmts. (b)-(d).

### 1. FREEDOM OF CONTRACT

 We find applicable here our observations in *Lawrence*, in which this Court affirmed the enforceability of an agreement related to the Workers' Compensation Act and considered public policies relevant at that time:

> Undoubtedly, the issue we face raises critical and complex public policy issues. And the administration of the workers' compensation system is heavily imbued with public policy concerns. At the same time, we have long recognized a strong public policy in favor of preserving the freedom of contract. Courts must exercise judicial restraint in deciding whether to hold arm's-length contracts void on public policy grounds:
>
> . . . .
>
> Given the lack of any clear legislative intent to prohibit agreements like the ones before us, and absent any claim by the petitioners of fraud, duress, accident, mistake, or failure or inadequacy of consideration, we decline to declare them void on public policy grounds. We believe the factually-intensive, competing public policy concerns raised by the parties and by amici in these cases are not clearly resolved by the statute and are best resolved by the Legislature, not the judiciary.

*Lawrence*, 44 S.W.3d at 553. This Court has long recognized Texas' strong public policy in favor of preserving the freedom

of contract. Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."); *see also Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 371 (Tex.2001); *Lawrence*, 44 S.W.3d at 553 (citations omitted); *Wood Motor Co. v. Nebel*, 150 Tex. 86, 238 S.W.2d 181, 185 (1951).

> [I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.

*Nebel*, 238 S.W.2d at 185 (quoting *Printing & Numerical Registering Co. v. Sampson*, LR 19 Eq 462, 465, 1874 WL 16322 (1875)). We also recognize the importance of the "indispensable partner" to the freedom of contract: contract enforcement. *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 176 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (en banc). Importantly, freedom of contract is not unbounded. "As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 & n. 11 (Tex.2004); *see Sonny Arnold, Inc. v. Sentry Sav. Ass'n*, 633 S.W.2d 811, 815 (Tex. 1982) (recognizing "the parties' right to contract with regard to their property as

---

the enforcement of the particular term." RE-STATEMENT (SECOND) OF CONTRACTS § 178(2).

**19.** "In weighing a public policy against enforcement of a term, account is taken of (a) the strength of that policy as manifested by legislation or judicial decisions, (b) the likelihood that a refusal to enforce the term will

further that policy, (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and (d) the directness of the connection between that misconduct and the term." RESTATEMENT (SECOND) OF CONTRACTS § 178(3).

they see fit, so long as the contract does not offend public policy and is not illegal"). Absent strong public policy reasons for holding otherwise, however, the preservation of contractual freedom and enforcement is no less applicable to the relationship between an insured and insurer. *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648, 649 (Tex.2007).

■ The Legislature determines public policy through the statutes it passes. *Stafford Estates Ltd. P'ship*, 135 S.W.3d at 628; *Grizzle*, 96 S.W.3d at 250 (Texas' public policy is reflected in its statutes); *FM Props. Operating Co.*, 22 S.W.3d at 873. The Legislature has passed many laws declaring certain agreements illegal and, therefore, against public policy. *See, e.g.*, TEX. BUS. & COM.CODE § 2.302 (unconscionable contracts); *Id.* § 15.05 (contracts in restraint of trade or commerce); TEX. FIN.CODE § 302.001 (contracts for usurious interest); TEX. CIV. PRAC. & REM.CODE §§ 127.002–.003 (certain mineral agree-

ments that provide for indemnification of a negligent indemnitee).

In other cases, the Legislature has decided that public policy requires certain conditions be met before an agreement may be enforceable. *See, e.g.*, TEX. BUS. & COM.CODE § 17.42 (A consumer's waiver of DTPA remedies is against public policy unless specific requirements are met.); TEX. GOV'T CODE § 2254.005 (Contracts for professional services not obtained in compliance with the Professional Services Procurement Act are void as against public policy.); TEX. LAB.CODE § 406.035 (Except as provided by statute, an agreement waiving an employee's right to workers' compensation is void.).

Also, this Court has held in a number of cases over the years that public policy clearly disfavors certain types of agreements.[20] In these circumstances, the Court has exercised its authority to determine and enforce public policy.

---

**20.** *See, e.g., Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 559 (Tex.2006) (holding that agreement between lawyer and client providing for termination fee was against public policy); *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 82, 87 (Tex.2004) (holding that assignment of claims for violations of the Texas Deceptive Trade Practices—Consumer Protection Act was against public policy); *Johnson v. Brewer & Pritchard, P. C.*, 73 S.W.3d 193, 205 (Tex. 2002) (holding that lawyer fee-sharing agreement was against public policy); *State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696, 698, 705 (Tex.1996) (holding that insured's prejudgment assignment of claims against liability insurer was against public policy); *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 316 (Tex.App.-San Antonio 1994, writ ref'd) (holding that assignment of legal malpractice claims was against public policy); *Elbaor v. Smith*, 845 S.W.2d 240, 241 (Tex. 1992) (holding that Mary Carter agreements, in which the defendant receives assignment of part of plaintiff's claim and both remain parties at trial were against public policy); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670,

681 (Tex.1990) (holding that unreasonable non-competition agreement was against public policy); *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 663 (Tex. 1990) (same); *Int'l Proteins Corp. v. Ralston–Purina Co.*, 744 S.W.2d 932, 934 (Tex.1988) (holding that assignment of plaintiff's claims against one tortfeasor to another tortfeasor was against public policy); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987) (holding that indemnity against one's own negligence was against public policy without express language); *Trevino v. Turcotte*, 564 S.W.2d 682, 690 (Tex.1978) (holding that assignment of right to challenge will to one who had taken under will was against public policy); *Crowell v. Housing Auth. of Dallas*, 495 S.W.2d 887, 889 (Tex.1973) (holding that lease provision exempting landlord from tort liability to tenants was against public policy); *Hooks v. Bridgewater*, 111 Tex. 122, 229 S.W. 1114, 1118 (Tex.1921) (holding that contract transferring custody of a child in exchange for permitting the child to inherit from the transferee was against public policy).

## 2. PURPOSE OF EXEMPLARY DAMAGES

In situations where the Legislature has not spoken directly on whether public policy prohibits insurance coverage of exemplary damages for gross negligence, a court should consider the purpose of exemplary damages. The common law and legislative development of exemplary damages in Texas informs this analysis.

For over 150 years, this Court has held that exemplary damage awards serve to punish the wrongdoer and set "a public example to prevent the repetition of the act." *Cole v. Tucker,* 6 Tex. 266, 268 (1851); *Graham v. Roder,* 5 Tex. 141, 149 (1849); *see also Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 555 (Tex. 1985). We confirmed that dual purpose in *Transportation Insurance Co. v. Moriel,* citing the Legislature's definition of exemplary damages in force at the time of the opinion: " 'Exemplary damages' " means "any damages awarded as an example to others, as a penalty, or by way of punishment." 879 S.W.2d 10, 16 (Tex.1994). Although some pre-*Moriel* decisions recognized that exemplary damages "also exist to reimburse for losses too remote to be considered as elements of strict compensation" or to compensate a plaintiff for inconvenience and attorneys fees, these cases do not undermine the longstanding *primary*

purpose of exemplary damages: to punish and deter. *See Hofer v. Lavender,* 679 S.W.2d 470, 474 (Tex.1984) (citing *Mayer v. Duke,* 72 Tex. 445, 10 S.W. 565 (1889)); *Allison v. Simmons,* 306 S.W.2d 206, 211 (Tex.Civ.App.-Waco 1957, writ ref'd n.r.e.); *Foster v. Bourgeois,* 253 S.W. 880 (Tex. Civ.App.-Austin 1923), *aff'd,* 113 Tex. 489, 259 S.W. 917 (Tex.1924).

Legislative enactments of the last decade clarify compensatory recovery is not a component of exemplary damages in Texas today, and the most recent enactments downplay the role of deterrence and focus squarely on the punitive aspect. Act of April 11, 1995, 74th Leg., R. S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (deleting "as an example to others" from the definition and instead defining exemplary damages as "any damages awarded as a penalty or by way of punishment"), *amended by* Act of June 2, 2003, 78th Leg., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887 (current version at Tex. Civ. Prac. & Rem.Code § 41.001(5)) (" 'Exemplary damages' means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages.")[21]

Chapter 41 of the Texas Civil Practice and Remedies Code also makes clear that

**21.** Many of the other "remote" categories of damages reflected in previous exemplary damage awards are now available, or explicitly unavailable, by Legislative enactment rather than as a component of exemplary damages. *See, e.g.,* Tex. Bus. & Com.Code § 17.50(d) (prevailing consumers "shall" recover attorney's fees under the Texas Deceptive Trade Practices Act); Tex. Civ. Prac. & Rem.Code § 41.001(4) (" 'Economic damages' means compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; *the term does not include exemplary damages* or noneconomic damages.") (emphasis added); *id.* § 41.001(12) (" 'Noneconomic damages' means damages

awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind *other than exemplary damages."*) (emphasis added); *see also New Amsterdam Cas. Co. v. Tex. Indus. Inc.,* 414 S.W.2d 914, 915 (Tex.1967) (restating "the rule that statutory provisions for the recovery of attorney's fees are in derogation of the common law"). These Legislative enactments demonstrate the punitive nature of exemplary damages.

the punishment imposed through exemplary damages is to be directed at the wrongdoer. Section 41.006 provides that "[i]n any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." A defendant's liability for exemplary damages based on the conduct of employees, agents, and associates is also limited. Section 41.005 provides that "a court may not award exemplary damages against a defendant because of the criminal act of another" unless:

(1) the criminal act was committed by an employee of the defendant;

(2) the defendant is criminally responsible as a party to the criminal act under the provisions of Chapter 7, Penal Code;

(3) the criminal act occurred at a location where, at the time of the criminal act, the defendant was maintaining a common nuisance under the provisions of Chapter 125, Civil Practice and Remedies Code, and had not made reasonable attempts to abate the nuisance; or

(4) the criminal act resulted from the defendant's intentional or knowing violation of a statutory duty under Subchapter D, Chapter 92, Property Code, and the criminal act occurred after the statutory deadline for compliance with that duty.

TEX. CIV. PRAC. & REM.CODE § 41.005(a)-(b). Even when the actor is the defendant's employee, the defendant is not liable for exemplary damages unless:

(1) the principal authorized the doing and the manner of the act;

(2) the agent was unfit and the principal acted with malice in employing or retaining him;

(3) the agent was employed in a managerial capacity and was acting in the scope of employment; or

(4) the employer or a manager of the employer ratified or approved the act.

*Id.* § 41.005(c). Chapter 41 provides that exemplary damages can be awarded for fraud, malice, gross negligence, or certain statutory violations. *Id.* § 41.003(a), (c). "Fraud" does not include constructive fraud. *Id.* § 41.001(6). "Malice" requires specific intent to cause substantial injury. *Id.* § 41.001(7). "Gross negligence" is defined as:

an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Id.* § 41.001(11). Other statutory actions may prescribe a different culpable mental state for exemplary damages. *Id.* § 41.003(c). With these basic standards in mind, Section 41.011(a) provides:

In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of the defendant.

*Id.* § 41.011(a).

The first, second, and fifth evidentiary factors raise concerns of an objective nature. How did the conduct of the defendant, viewed in the abstract, irrespective of the parties, depart from broad norms or expectations? It does not matter whether the defendant was a conglomerate or an individual; the nature of the conduct is what matters. On the other hand, the third, fourth, and sixth factors focus subjectively—because the issue is punishment—on the individual parties. What will it take to punish the defendant?

There is some inherent tension between the policies recognized by freedom of contract and the policy behind awarding exemplary damages. Spreading the risk of, and obligation for, exemplary damages through insurance does not affect the objective factors. They may be evaluated without regard for individual personalities. The issue is this: What penalty should this conduct, in the abstract, bear? But the subjective factors are relevant to a determination of the amount of exemplary damages only if the *defendant* must pay it to the *plaintiff.* If exemplary damages are to be paid by insurance, it is less relevant to set the amount based on whether the plaintiff was trusting or the defendant calculating or wealthy.

A few cases applying Texas law have considered whether insurance for exemplary damages is against public policy in light of the purpose behind exemplary damages. Their reasoning regarding the interplay of these competing policies is instructive.

Texas appellate courts have uniformly rejected as against public policy coverage under uninsured or underinsured motorist policies when the insured seeks to recover from his own insurer exemplary damages assessed against a third-party tortfeasor.[22] In that situation, the burden of the exemplary damages would fall entirely on the insurer and its policyholders, not on the tortfeasor, thereby entirely defeating the purpose of such damages. In one case, *State Farm Mutual Automobile Insurance Co. v. Shaffer,* Shaffer was injured in an automobile accident with Torres. 888 S.W.2d at 147. The court of appeals held that it was against public policy to require State Farm, Shaffer's insurer, to pay exemplary damages assessed against Torres. *Id.* at 149. Citing Chapter 41 as establishing the basis and manner for assessing exemplary damages, the court explained that "neither deterrence of wrongful conduct nor punishment of Torres, the wrongdoer, is achieved by imposing exemplary damages upon Shaffer's insurance carrier for Torres' wrongful act." *Id.* (citations omitted).

Other Texas courts of appeals have noted that the policy considerations regarding exemplary damages coverage depend on whether the basis for the damages is the conduct of the insured's employees or agents. In *American Home Assurance Co. v. Safway Steel Products Co.,* the insurers appealed a declaratory judgment in favor of the insureds for coverage of exemplary damages. 743 S.W.2d 693, 695–96 (Tex.App.-Austin 1987, writ denied). Exemplary damages of $750,000 and $1 million had been assessed against the in-

---

**22.** *Milligan v. State Farm Mut. Auto. Ins. Co.,* 940 S.W.2d 228, 232 (Tex.App.-Houston [14th Dist.] 1997, writ denied), *overruling Home Indemnity Co. v. Tyler,* 522 S.W.2d 594 (Tex.Civ. App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.); *State Farm Mut. Auto. Ins. Co. v. Shaffer,* 888 S.W.2d 146, 149 (Tex.App.-Houston [1st Dist.] 1994, writ denied); *Vanderlinden v. USAA Prop. & Cas. Ins. Co.,* 885 S.W.2d 239, 242 (Tex.App.-Texarkana 1994, writ denied); *Gov't Employees Ins. Co. v. Lichte,* 792 S.W.2d 546, 549 (Tex.App.-El Paso 1990), *writ denied,* 825 S.W.2d 431 (Tex.1991) (per curiam).

sureds, respectively, in one case for gross negligence in failing to warn about the limitations of a football helmet the insured manufactured and in the other case for gross negligence in the design and marketing of a scaffold. *Id.*

The court of appeals observed that while allowing exemplary damages coverage shifts the burden of the punishment to "the innocent members of society who purchase insurance," contrary to the purpose of such damages, disallowing coverage for a large corporation means that exemplary damages for the misconduct of perhaps one or only a few employees will "inevitably be passed on to the consumers of its products—who are also innocent," also contrary to the damages' purpose. *Id.* at 704.

In *DaimlerChrysler Insurance Co. v. Apple*, an employee claimed that three of his employer's managers had defamed him. No. 01–05–01115–CV, 2007 WL 3105899, at *1–2, —— S.W.3d ——, —— (Tex.App.-Houston [1st Dist.], Oct. 25, 2007, reh'g filed). The trial court confirmed in part the arbitration panel's assessment of exemplary damages of $500,000 against the employer, $500,000 against its owner and CEO, and $50,000 each against the three managers, all of whom were determined to be vice-principals. *Id.* at *3 & n. 4, at —— & n. 4.[23] Following an appeal, the employer settled with the employee, but the employer's insurer under both a CGL policy and an umbrella policy refused coverage of the exemplary damage awards, arguing in part that such coverage was against public policy. *Id.* at *3–4, at ——. The court of appeals disagreed but limited its holding to circumstances "where a corporation is held liable for conduct by vice-principals; the conduct was done without the participation or knowledge of the CEO, officers or shareholders of the corporation." *Id.* at *18, at —— (citations omitted). The court explained that under these circumstances "the agreement ... serves the public good because [the employer], its CEO, its officers, and its shareholders did not commit the wrongful acts and should be allowed to have their insurance policy, for which they paid, indemnify them for the punitive damages." *Id.* (citations omitted).[24]

These courts of appeals cases highlight the general considerations that are important when determining whether the policy behind exemplary damages should limit parties' ability to contract for coverage of those damages. In the uninsured and underinsured motorist context, it may be ap-

**23.** *See also Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997) (stating that "the general rule in Texas" is set out in RE-STATEMENT OF TORTS § 909 (1939): "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act.").

**24.** Similarly, the court of appeals in *Westchester Fire Insurance Co. v. Admiral Insurance Co.*, made a limited holding that exemplary damages in a case involving grossly negligent treatment of a nursing home resident were, under the applicable statute in effect when the underlying suit against the insured was settled, insurable. 152 S.W.3d 172, 176 (Tex. App.-Fort Worth 2004, pet. filed). The primary carrier filed a motion for partial summary judgment, arguing that Texas public policy prohibits insurance coverage of exemplary damages. The trial court concluded that any coverage for exemplary damages under the policy was void. The court of appeals reversed, deciding that Texas public policy *at the times relevant* to the underlying case did not preclude coverage for exemplary damages under the primary carrier's policy. *Id.* at 189–90.

propriate for policyholders to share in the burden of injuries caused by underinsured motorists, but not their punishment. In other words, the purpose of exemplary damages may not be achieved by penalizing those who obtain the insurance required by law for the wrongful acts of those who do not.

The considerations may weigh differently when the insured is a corporation or business that must pay exemplary damages for the conduct of one or more of its employees. Where other employees and management are not involved in or aware of an employee's wrongful act, the purpose of exemplary damages may be achieved by permitting coverage so as not to penalize many for the wrongful act of one. When a party seeks damages in these circumstances, courts should consider valid arguments that businesses be permitted to insure against them.

Extreme circumstances may prompt a different analysis. The touchstone is freedom of contract, but strong public policies may compel a serious analysis into whether a court may legitimately bar contracts of insurance for extreme and avoidable conduct that causes injury. For example, liability policies themselves normally bar insurance for damages caused by intentional conduct, as did the liability policy in this case. The fact that insurance coverage for exemplary damages may encourage reckless conduct likewise gives us pause. Were the existence of insurance coverage to completely eviscerate the punitive purpose behind awarding exemplary damages, it could defeat not only an explicit legislative policy but also the court's traditional role in deterring conscious indifference. *See* RESTATEMENT (SECOND) OF CONTRACTS § 178(3). However, JUSTICE HECHT's concurrence would go further and more fully address these circumstances.

## IV. CONCLUSION

The Legislature authorized the Texas Department of Insurance to create a policy that provides insurance coverage for exemplary damages in workers' compensation cases. Thus, we decline to invalidate the parties' workers' compensation contract to enforce a public policy urged by Fairfield but not adopted by the Legislature. In response to the certified question, we answer that the public policy of Texas does not prohibit insurance coverage of exemplary damages for gross negligence in the workers' compensation context. However, without clear legislative intent to generally prohibit or allow the insurance of exemplary damages arising from gross negligence, we decline to make a broad proclamation of public policy here but instead offer some considerations applicable to the analysis in other cases. Of course, how our answer is applied in the case before the Fifth Circuit is solely the province of that certifying court. *Amberboy v. Societe de Banque Privee,* 831 S.W.2d 793, 798 (Tex.1992).

Justice HECHT filed a concurring opinion, joined by Justice BRISTER, Justice MEDINA, and Justice WILLETT.

Justice JOHNSON filed a concurring opinion.

Justice HECHT, joined by Justice BRISTER, Justice MEDINA, and Justice WILLETT, concurring.

The United States Court of Appeals for the Fifth Circuit has certified to us[1] this question: "Does Texas public policy pro-

---

**1.** *See* TEX. CONST. art. V, § 3–c(a) ("The supreme court and the court of criminal appeals have jurisdiction to answer questions of state law certified from a federal appellate court."); TEX.R.APP. P. 58 (prescribing procedures for certification of questions of law by federal appellate courts).

hibit a liability insurance provider from indemnifying an award for punitive damages imposed on its insured because of gross negligence?"[2] As usual, the Circuit "disclaim[s] any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the question certified."[3] The Court answers "no" for the workers' compensation insurance at issue in the federal court action, but the Circuit's question is broader and deserves a fuller response than the Court gives. The Court provides some insight into the relevant considerations, but I would add to them and describe in more detail the way they should be analyzed. Most of what I say is consistent with the Court's opinion, and to that extent I join it.

## I

I begin with a few general observations.

Texas law recognizes and protects a broad freedom of contract. We have repeatedly said that:

if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.[4]

Still, freedom of contract is not unbounded. "As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."[5]

We have voided contractual provisions that are contrary to public policy,[6] includ-

2. *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 381 F.3d 435, 437 (5th Cir.2004) (per curiam).

3. *Id.*

4. *Gym–N–I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex.2007) (commercial lease expressly waiving warranties) (quoting *Wood Motor Co. v. Nebel*, 150 Tex. 86, 238 S.W.2d 181, 185 (1951) (construing contract termination clause) (quoting *Printing & Numerical Registering Co. v. Sampson*, LR 19 Eq 462, 465, 1874 WL 16322 (1875))); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 130 n. 11 (Tex.2004) (contractual jury waiver) (quoting *Wood Motor Co.* and *Sampson); BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex.2005) (liquidated damages clause) (quoting *Wood* and *Sampson); Missouri, Kan. & Tex. Ry. Co. of Tex. v. Carter*, 95 Tex. 461, 68 S.W. 159, 164 (Tex.1902) (contract waiving responsibility for fires caused by railroad engines) (quoting *Sampson* ).

5. *In re Prudential*, 148 S.W.3d at 129 & n. 11; *see Sonny Arnold, Inc. v. Sentry Sav. Ass'n*, 633 S.W.2d 811, 815 (Tex.1982) (recognizing "the parties' right to contract with regard to their property as they see fit, so long as the contract does not offend public policy and is

not illegal"); *Woolsey v. Panhandle Refining Co.*, 131 Tex. 449, 116 S.W.2d 675, 678 (Tex. 1938) ("In line with the universally accepted rule, this court has repeatedly refused to enforce contracts which are either expressly or impliedly prohibited by statutes or by public policy."); *Curlee v. Walker*, 112 Tex. 40, 244 S.W. 497, 498 (Tex.1922) ("The law recognizes the right of parties to contract with relation to property as they see fit, provided they do not contravene public policy and their contracts are not otherwise illegal."); *James v. Fulcrod*, 5 Tex. 512, 520 (1851) ("That contracts against public policy are void and will not be carried into effect by courts of justice are principles of law too well established to require the support of authorities, and the only question is whether the agreement set forth in the petition be or not in violation of public policy or in fraud of the law."); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 178 (1981).

6. *See, e.g., Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 559 (Tex.2006) (termination fee agreement between lawyer and client); *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 82, 87 (Tex.2004) (assignment of claims for violations of the Texas Deceptive Trade Practices—Consumer Protec-

ing insurance policy provisions.[7] But we have also recognized that "[c]ourts must exercise judicial restraint in deciding whether to hold arm's-length contracts void on public policy grounds".[8] We observed long ago:

> According to the well-known dictum of an English judge, public policy "is a very

7. *See, e.g., National County Mut. Fire Ins. Co. v. Johnson,* 879 S.W.2d 1, 2 (Tex.1993) (family member exclusion in automobile liability policy); *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984) (aviation policy excluding coverage based on lapse of airworthiness certificate even when lapse is causally unrelated to loss); *Unigard Sec. Ins. Co. v. Schaefer,* 572 S.W.2d 303, 306 (Tex.1978) (au-tomobile liability policy endorsement excluding Personal Injury Protection coverage for one driver); *Jones v. Fid. & Guar. Ins. Co.,* 250 S.W.2d 281, 281–282 (Tex.Civ.App.-Waco 1952, writ ref'd) (policy covering innocent ex-wife for damages caused by ex-husband to their jointly-owned property), *overruled by Kulubis v. Tex. Farm Bureau Underwriters Ins. Co.,* 706 S.W.2d 953, 955 (Tex.1986); *International Travelers' Ass'n v. Branum,* 109 Tex. 543, 212 S.W. 630 (Tex.1919) (policy provision prescribing venue); *Cheeves v. Anders,* 87 Tex. 287, 28 S.W. 274, 275 (Tex.1894) (public policy does not allow one who lacks an insurable interest to own a policy on another's life, but an insurer may be required to pay proceeds to proper parties, and, here, to reimburse an ex-partner for premiums paid by partners' now-dissolved firm); *Mayher v. Manhattan Life Ins. Co.,* 87 Tex. 169, 27 S.W. 124, 125 (Tex.1894) ("It is against public policy for one man to become interested in the death of another when he has no interest in the continuance of life."). *Compare Burch v. Commonwealth County Mut. Ins. Co.,* 450 S.W.2d 838, 840–841 (Tex.1970) (public policy would preclude an insurance company from knowingly assuming a previously-occurring loss, but not when the loss was unknown to person arranging for the insurance, and there was no conscious or negligent failure to advise him of it); *Hatch v. Turner,* 145 Tex. 17, 193 S.W.2d 668, 669–670 (Tex.1946) (life insurance policy limiting benefits to premiums paid if covered person killed in military service in war was not against public policy); *Equitable Life Assur. Soc'y v. Hazlewood,* 75 Tex. 338, 12 S.W. 621, 624–625 (Tex.1889) (insured's brother, and insured himself, have an insurable interest in insured's life).

tion Act); *Johnson v. Brewer & Pritchard, P. C.,* 73 S.W.3d 193, 205 (Tex.2002) (lawyer fee-sharing agreement); *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 698 (Tex.1996) (defendant insured's prejudgment assignment to plaintiff of claims against liability insurer); *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 314 (Tex.App.-San Antonio 1994, writ ref'd) (assignment of legal malpractice claims); *Elbaor v. Smith,* 845 S.W.2d 240, 241 (Tex.1992) ("Mary Carter" agreements, in which the defendant receives assignment of part of plaintiff's claim and both remain parties at trial); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 681 (Tex.1990) (unreasonable non-compete agreement); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 663 (Tex.1990) (same); *International Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988) (assignment of plaintiff's claims against one tortfeasor to another tortfeasor); *Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168 (Tex.1987) (covenant not to compete in a "common calling"); *Bergman v. Norris of Houston,* 734 S.W.2d 673 (Tex.1987) (same); *Trevino v. Turcotte,* 564 S.W.2d 682, 690 (Tex.1978) (assignment of right to challenge will to one who had elected to take under will); *Crowell v. Housing Auth. of Dallas,* 495 S.W.2d 887, 889 (Tex.1973) (lease provision exempting authority from tort liability to tenants); *Hooks v. Bridgewater,* 111 Tex. 122, 229 S.W. 1114, 1118–1119 (Tex. 1921) (contract transferring custody of a child in exchange for permitting the child to inherit from the transferee); *Barnhart v. Kan. City, Mex. & Orient Ry. Co.,* 107 Tex. 638, 184 S.W. 176, 179 (1916) (contract in which employee assumes the risk of workplace injury); *Texas Standard Cotton Oil Co. v. Adoue,* 83 Tex. 650, 19 S.W. 274 (Tex.1892) (contract creating a combination to fix prices).

8. *Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 553 (Tex.2001), *superseded by statute,* Act of June 17, 2001, 77th Leg., R.S., ch. 1456, §§ 16.01, 17.01 & 17.02, 2001 Tex. Gen. Laws 5196, *as explained in Villareal v. Steve's & Sons Doors, Inc.,* 139 S.W.3d 352, 353–354 (Tex.App.-San Antonio 2004, no pet.) (new statute applied because employee was injured on July 21, 2001, after amendment's June 17, 2001 effective date).

unruly horse, and when you once get astride it, you never know where it will carry you." This striking illustration admonishes us that the words "public policy" are vague in meaning and dangerous of application, and that, unless we exercise due discrimination, we are likely to fall into error when we come to apply them to the construction of a contract, with a view to determine the validity of its provisions.[9]

For this reason, a state's public policy must be carefully "deduced from its constitution, laws, and judicial decisions."[10] The requirement of deduction is critical; it circumscribes judicial authority. Courts are to derive public policy from existing law, not create it. And courts must also recognize that public policy may change over time.[11]

Insurance is "an agreement by which one party assumes a risk faced by another in return for a premium payment."[12] This risk-shifting is the purpose of insurance.[13] When the agreement is unique, the insured's risk is transferred to an insurer who bears it alone, but when the agreement is a standard policy offered by an insurer to the general public, the insured's risk is, in a real sense, borne by the insur-

---

9. *Singer Mfg. Co. v. Rios,* 96 Tex. 174, 71 S.W. 275, 276 (Tex.1903) (concluding that a sewing machine mortgage provision that allowed the mortgagee to repossess the property, which he did without violence, was not void as against public policy) (citation omitted).

10. *McElreath v. McElreath,* 162 Tex. 190, 345 S.W.2d 722, 746 (Tex.1961) (citations omitted); *see Vidal v. Girard's Ex'rs,* 43 U.S. (2 How.) 127, 197–198, 11 L.Ed. 205 (1844) ("The question, what is the public policy of a State, and what is contrary to it, if inquired into beyond [the limits of what its constitution, laws, and judicial decisions make known], will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions, and upon which men may and will complexionally differ...."); *Town of Flower Mound v. Stafford Estates Ltd. P'ship,* 135 S.W.3d 620, 628 (Tex. 2004) ("Generally, 'the State's public policy is reflected in its statutes.'" (quoting *Texas Commerce Bank, N.A. v. Grizzle,* 96 S.W.3d 240, 250 (Tex.2002))); *Lawrence,* 44 S.W.3d at 553 ("Public policy, some courts have said, is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law." (internal quotations and citation omitted)); *Castillo v. Canales,* 141 Tex. 479, 174 S.W.2d 251, 253 (Tex.1943) ("The Legislature has the power to declare what shall be the policy of the State with reference to insurance matters."); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 179 (1981) ("A public policy against the enforcement of promises or other terms may be derived by the court from (a) legislation relevant to such a policy, or (b) the need to protect some aspect of the public welfare....").

11. *State v. City of Austin,* 160 Tex. 348, 331 S.W.2d 737, 741 (Tex.1960) ("[S]tatutes and ordinances express the public policy of the state as it existed at the time of their adoption. Subject to constitutional limitations, however, that policy may be changed by the Legislature at any time.").

12. BLACK'S LAW DICTIONARY 802 (7th ed.1999); *see* 1 HOLME'S APPLEMAN ON INSURANCE 2D § 1.2, at 3–4 (1996) ("At its core essence, risk is the Mother Mold of insurance."); COUCH ON INSURANCE 3D § 1.9 (2005) ("The primary requisite essential to a contract of insurance is the assumption of a risk of loss and the undertaking to indemnify the insured against such loss." (footnotes omitted)).

13. *Fortis Benefits v. Cantu,* 234 S.W.3d 642, 647 (Tex.2007) ("an insurance policy's fundamental purpose ... is to protect the insured by shifting the risk of loss to the insurer"); *Insurance Co. of N. Am. v. Morris,* 981 S.W.2d 667, (Tex.1998) (risk-shifting and risk-pooling "are quintessential elements of insurance contracts").

er's policyholders as a group, from whose pool of premiums all claims must be paid if the insurer is to remain in business. One public-policy concern is whether it is or is not in the public interest for a risk to be shifted. As the cases cited in the margin illustrate, public policy sometimes insists on risk-shifting,[14] sometimes prohibits it,[15] and sometimes is indifferent, leaving the matter to the parties' contract.[16]

In some instances, the effect of public policy on insurance is relatively simple and uncontroversial. For example, the beneficiary of a life insurance policy must have an insurable interest in the insured's life. As the basis for that rule, we quoted the United States Supreme Court more than a century ago: "It is generally agreed that mere wager policies—that is, policies in which the assured party has no interest whatever in the matter insured, but only an interest in its loss or destruction—are void, as against public policy."[17] The rule is unquestioned to this day. As another court has more recently explained:

The insurable interest requirement for beneficiaries of life insurance rests on two coexisting policy considerations: (1) that no inducement be offered to one person to take the life of another; and (2) that no one should be permitted to wager on the continuation of a human life.[18]

Other instances, however, may implicate multiple, conflicting policies. For example, we once held that if co-owners of property were insured under the same policy and one of them damaged the property, the innocent owner could not recover on the policy because the wrongdoer would also benefit through his ownership interest, and "public policy dictates that a wrongdoer should not benefit from his wrongdoing."[19] Years later, we came to see that the public policy concerns implicated in the issue were broader and conflicting; these concerns include the prevention of insurance fraud by co-owners acting in collusion, the prevention of unjust enrichment of insurers, and the injustice of imputing one person's criminal acts to an

**14.** *See, e.g., National County Mut. Fire Ins. Co. v. Johnson,* 879 S.W.2d 1, 2 (Tex.1993) (family member exclusion in automobile liability policy was against public policy); *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex. 1984) (aviation policy excluding coverage based on lapse of airworthiness certificate even when lapse is causally unrelated to loss was against public policy); *Unigard Sec. Ins. Co. v. Schaefer,* 572 S.W.2d 303, 306 (Tex. 1978) (automobile liability policy endorsement excluding Personal Injury Protection coverage for one driver was against public policy); *Kulubis v. Tex. Farm Bureau Underwriters Ins. Co.,* 706 S.W.2d 953, 955 (Tex. 1986) (policy covering loss to innocent exspouse for damages to co-owned property was not against public policy).

**15.** *See, e.g., Burch v. Commonwealth County Mut. Ins. Co.,* 450 S.W.2d 838, 840–841 (Tex. 1970) (holding that a policy covering a known loss was against public policy); *Jones v. Fid. & Guar. Ins. Corp.,* 250 S.W.2d 281, 281–282 (Tex.Civ.App.-Waco 1952, writ ref'd) (policy

covering innocent ex-wife for damages caused by ex-husband to their jointly-owned property was against public policy), *overruled by Kulubis,* 706 S.W.2d at 955.

**16.** *See, e.g., Hatch v. Turner,* 145 Tex. 17, 193 S.W.2d 668, 669–670 (Tex.1946) (holding that public policy did not prohibit, though it certainly did not require, a life insurance policy provision limiting benefits to premiums paid if covered person killed in military service in war).

**17.** *Equitable Life Assur. Soc'y v. Hazlewood,* 75 Tex. 338, 12 S.W. 621, 624 (Tex.1889) (quoting *Connecticut Mut. Life Ins. Co. v. Schaefer,* 94 U.S. 457, 460, 24 L.Ed. 251 (1877)).

**18.** *See Stillwagoner v. Travelers Ins. Co.,* 979 S.W.2d 354, 360 (Tex.App.-Tyler 1998, no pet.).

**19.** *Kulubis,* 706 S.W.2d at 955.

innocent victim.[20] On balance, we concluded that the law should permit the innocent insured to recover, at least in some circumstances.[21] Still later, we held that when the co-insureds were married and the property was community, recovery on the policy by the innocent spouse could not be conditioned on divorce or partition because the public policy against divorce was more important than the possibility that the wrongdoing spouse might benefit.[22] Different policies called for a different rule in different situations.

In sum, "the business of [insurance] is affected with a public interest"[23] that is neither simple nor static and that supercedes the parties' freedom to contract for the shifting of risks in some instances and not in others. With that predicate in mind, I turn to the Circuit's question.

## II

The sources of public policy considerations relevant to the Circuit's question are statutes stating the purpose of punitive damages and prescribing the manner in which they are to be assessed, other statutes allowing and disallowing insurance for punitive damages, administrative regulations of insurance, Texas caselaw, and caselaw in other American jurisdictions. I examine each in turn.

## A

The first public policy consideration, and perhaps the most important because the Legislature has firmly spoken, is that the purpose of punitive damages is to punish. At one time, punitive damages were awarded not only to punish the defendant (hence "punitive") but to deter others (hence "exemplary") and to compensate the plaintiff for losses for which the law provided no recovery, like inconvenience, attorney fees, and mental anguish.[24] But over the years, new elements of damages became recoverable for many causes of action, thus affording a fuller range of compensation for many claimants. Eventually, in 1987, the Legislature limited the purpose of punitive damages, providing, in Chapter 41 of the Texas Civil Practice and Remedies Code, at section 41.001(3) that:

20. *Id.*

21. *Id.*

22. *Texas Farmers Ins. Co. v. Murphy,* 996 S.W.2d 873, 880–881 (Tex.1999).

23. *Burch v. Commonwealth County Mut. Ins. Co.,* 450 S.W.2d 838, 841 (Tex.1970).

24. *Hofer v. Lavender,* 679 S.W.2d 470, 474 (Tex.1984) ("Of course, punishment of the wrongdoer is one purpose of exemplary damages. But, as recently as last year, we have stated that another of the purposes of such damages is to serve as an example to others. *Pace v. State,* 650 S.W.2d 64, 65 (Tex.1983). We said the same thing in *Sheffield Division, Armco Steel Corp. v. Jones,* 376 S.W.2d 825, 831 (Tex.1964). An earlier supreme court had concluded that exemplary damages also exist to reimburse for losses too remote to be considered as elements of strict compensation. *Mayer v. Duke,* 72 Tex. 445, 10 S.W. 565 (1889)."); *City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex.1997)("For this reason, Texas courts at one time categorized mental anguish in most types of cases as too remote or speculative to be compensable as actual damages, holding the emotional consequences of the tort relevant only to exemplary damages. *See Crawford v. Doggett,* 82 Tex. 139, 17 S.W. 929, 930 (1891) (citing *Traweek v. Martin–Brown Co.,* 79 Tex. 460, 14 S.W. 564, 565–66 (1890))...."); *Travelers Indem. Co. of Ill. v. Fuller,* 892 S.W.2d 848, 852 n. 5 (Tex.1995) ("The history of punitive damages also reveals that the early courts considered the remedy a part of the jury's discretion to punish an offender who had injured the plaintiff in some aggravated fashion. The early judges gave the jury discretion to inflate a *general* damage award where the plaintiff's injury, though comparatively small, was inflicted in a manner which the law sought to prevent.").

"Exemplary damages" means any damages awarded as an example to others, as a penalty, or by way of punishment. "Exemplary damages" includes punitive damages.[25]

Based on this statute, we held that "punitive damages are levied for the public purpose of punishment and deterrence",[26] omitting—as the Legislature had done—compensation to the plaintiff as part of the purpose of punitive damages. In 1995, the Legislature renumbered the provision Section 41.001(5) and amended it to delete the phrase, "as an example to others", leaving punishment as the sole purpose of punitive damages.[27] The statute was amended again in 2003,[28] again to

make clear that punitive damages are not compensatory, and it now states:

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages. "Exemplary damages" includes punitive damages.[29]

As originally enacted, Chapter 41 applied to any action for negligence and any action for personal injury, property damage, or death based on strict liability, products liability, or breach of warranty,[30] but there were sixteen exceptions.[31] In 1995, Chapter 41 was amended [32] to reduce

---

**25.** Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44.

**26.** *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994).

**27.** Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109.

**28.** Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887.

**29.** Tex. Civ. Prac. & Rem.Code § 41.001(5).

**30.** Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 45 (enacting § 41.002(a) to read: "This chapter applies to an action in which a claimant seeks exemplary damages relating to a cause of action as defined by Section 33.001.").

**31.** *Id.* at 45 (enacting § 41.002(b) to read: "(b) This chapter does not apply to: (1) an action brought under the Deceptive Trade Practices–Consumer Protection Act (Subchapter E, Chapter 17, Business & Commerce Code); (2) an action brought under Chapter 21, Insurance Code; (3) an action brought under the workers' compensation laws of this state (Article 8306 et seq., Revised Statutes); (4) an action to recover exemplary damages against an employer by the employee's beneficiaries in a death action arising out of the course and scope of employment where the employer is a subscriber under the workers' compensation laws of this state (Article 8306 et seq., Revised Statutes); (5) an action gov-

erned by Chapter 81, Civil Practice and Remedies Code; (6) an action brought under Chapter 246, Acts of the 63rd Legislature, Regular Session, 1973, Home Solicitation Transactions (Article 5069–13.01 et seq., Vernon's Texas Civil Statutes); (7) an action brought under Chapter 547, Acts of the 63rd Legislature, Regular Session, 1973, Debt Collection Practices (Article 5069–11.01 et seq., Vernon's Texas Civil Statutes); (8) an action brought under Chapter 54, 91, or 92, Property Code; (9) an action brought under the Texas Manufactured Housing Standards Act (Article 5221f, Vernon's Texas Civil Statutes); (10) an action brought under the Texas Motor Vehicle Commission Code (Article 4413(36), Vernon's Texas Civil Statutes); (11) an action brought under the Texas Proprietary School Act, Chapter 32, Education Code; (12) an action brought under Section 9.507 or Section 27.01, Business & Commerce Code; (13) an action brought under Chapter 36, Family Code; (14) an action brought under the Health Spa Act (Article 5221l, Vernon's Texas Civil Statutes); (15) an action brought under the Business Opportunity Act (Article 5069–16.01 et seq., Vernon's Texas Civil Statutes); or (16) an action brought under the Texas Timeshare Act (Article 6573c, Vernon's Texas Civil Statutes).").

**32.** Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109–110. *See also* Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 4.01, 1997 Tex. Gen. Laws 327, 328–329 (revising and amending § 41.002(b) to reflect 1995 amendments).

the exceptions to three: certain actions under the Texas Free Enterprise and Antitrust Act of 1983,[33] actions under the Deceptive Trade Practices—Consumer Protection Act[34] except as specifically provided in Section 17.50 of that Act,[35] and actions brought under Chapter 21 of the Texas Insurance Code.[36] A fourth exception was added in 2005 for actions under Chapter 36 of the Human Resources Code.[37] The Legislature's enlargement of the scope of Chapter 41 over time reflects its intent to establish punishment of the defendant as the sole purpose of punitive damages in Texas.

Chapter 41 also makes clear that the punishment imposed through punitive damages is to be directed at the wrongdoer. Section 41.006 provides that "[i]n any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." A defendant's liability for punitive damages based on the conduct of employees, agents, and associates is also limited. Section 41.005 provides that "a court may not award exemplary damages against a defendant because of the criminal act of another"[38] unless:

(1) the criminal act was committed by an employee of the defendant;

(2) the defendant is criminally responsible as a party to the criminal act under the provisions of Chapter 7, Penal Code;

(3) the criminal act occurred at a location where, at the time of the criminal act, the defendant was maintaining a common nuisance under the provisions of Chapter 125, Civil Practice and Remedies Code, and had not made reasonable attempts to abate the nuisance; or

(4) the criminal act resulted from the defendant's intentional or knowing violation of a statutory duty under Subchapter D, Chapter 92, Property Code, and the criminal act occurred after the statutory deadline for compliance with that duty.[39]

Even when the actor is the defendant's employee, the defendant is not liable for punitive damages unless:

(1) the principal authorized the doing and the manner of the act;

(2) the agent was unfit and the principal acted with malice in employing or retaining him;

(3) the agent was employed in a managerial capacity and was acting in the scope of employment; or

---

33. Tex. Bus. & Com.Code § 15.21 (allowing injured persons and governmental entities to recover treble damages for willful or flagrant violations of the Act).

34. *Id.* §§ 17.41–.63.

35. *See Id.* § 17.50(b) and (g) (providing that Chapter 41, Civil Practice & Remedies Code, does not apply to actions under this subchapter).

36. Chapter 21 has been repealed and its provision recodified. Act of May 22, 2003, 78th Leg., R.S., ch. 1274, 2003 Tex. Gen. Laws 3611.

37. Tex. Hum. Res.Code §§ 36.001–.132 ("Medicaid Fraud Prevention"); *id.* §§ 36.0011 (defining "culpable mental state"); 36.002(defining "unlawful acts"); 36.052 (allowing the state to recover, in addition to the payment or value of a benefit occasioned by an unlawful act, up to two times the amount of that payment or benefit, and, in some circumstances, other civil penalties); 36.101 (authorizing actions by private persons on behalf of themselves and the state); 36.110 (authorizing awards to private plaintiffs).

38. Tex. Civ. Prac. & Rem.Code § 41.005(a).

39. *Id.* § 41.005(b).

(4) the employer or a manager of the employer ratified or approved the act.[40]

If punitive damages are covered by insurance and paid from policyholders' premiums, so that the wrongdoer suffers no more than a sliver of the sanction, the sting of punishment is dissipated. As Judge John Minor Wisdom explained in his seminal opinion on the insurability of punitive damages in *Northwestern National Casualty Co. v. McNulty:*

> Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.

> The policy considerations in a state where ... punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well as nominally on the party actually responsible for the wrong. If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong. In actual fact, of course, and considering the extent to which the public is insured, the burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers. Society would then be punishing itself for the wrong committed by the insured.[41]

The insured in the case before us attempts to argue that insurance does not lessen the punishment of punitive damages. The insured's premiums may increase. Its insurance may be cancelled. It may be forced out of business. It will be stigmatized as a wrongdoer. But even if an insured would not escape altogether the consequences of punitive damages, insurance would indisputably spread them among many who deserve no punishment at all, which would contravene the policy clearly reflected in Chapter 41.

Rather clearly, insuring against punitive damages impairs their purpose.

### B

The next question is whether insuring against punitive damages is consistent with the manner in which they are assessed. Chapter 41 provides that punitive damages can be awarded for fraud, malice, gross negligence, or a statutory violation.[42] "Fraud" does not include constructive fraud.[43] "Malice" requires specific intent to cause substantial injury.[44] "Gross negligence" is defined as:

> an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

---

40. *Id.* § 41.005(c).

41. 307 F.2d 432, 440–441 (5th Cir. 1962).

42. Tex. Civ. Prac. & Rem. Code § 41.003(a), (c).

43. *Id.* § 41.001(6).

44. *Id.* § 41.001(7).

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.[45]

Other statutory actions may prescribe a different culpable mental state for punitive damages.[46] With these basic standards in mind, section 41.011(a) provides:

In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of the defendant.[47]

Three of these factors—(1), (2), and (5)—are objective. The nature of the wrong and character of the conduct consider the defendant's actions in the abstract, compared with broad norms and expectations. Were the defendant's actions the work of a moment or the product of careful plotting and planning? Did they threaten few or many? Were they merely wrong, or were they offensively wrong? Were they morally, criminally or otherwise especially culpable? Did they pose a heightened offense to public justice and propriety? For such questions, the identity of the defendant, whether an individual or an organization, is irrelevant; the nature of the conduct is what matters. On the other hand, three other factors—(3), (4), and

(6)—are subjective. What was the defendant thinking? Was he vile, angry, or malicious, or was he consciously indifferent to an objectively extreme degree of risk to others?[48] What was the plaintiff thinking? Was he trusting or suspicious? What will it take to punish the defendant? Is he an individual with limited means or an entity with a large net worth?

Applying the objective factors is akin to deciding whether a crime should be a misdemeanor or a felony. The seriousness of the misconduct is not affected by whether the corresponding punitive damages must be paid by the defendant's insurer rather than the defendant. But the subjective factors help determine what a specific defendant should be required to pay a specific plaintiff. If punitive damages are covered by insurance, and the burden of payment thus shared in effect by the insurer's policyholders, it makes no sense to set the amount based on whether the plaintiff was trusting or the defendant was calculating or wealthy. What a group should pay, as opposed to an individual, depends on how innocent most plaintiffs are, how culpable most defendants are, and the defendants' mean net worth. From individual, subjective circumstances one cannot extrapolate what penalty the community should bear.

The Legislature has required that the specific circumstances of a plaintiff and a defendant be taken into account in determining what amount of punitive damages should be assessed against the defendant and paid to the plaintiff. Insurance coverage makes this impossible. The amount an insured defendant will pay depends on the extent of coverage and any deductible. Thus, insuring against punitive damages

---

**45.** *Id.* § 41.001(11).

**46.** *Id.* § 41.003(c).

**47.** Id. § 41.011(a).

**48.** Id. § 41.001(11).

conflicts with the way in which such damages must be assessed under Chapter 41.

## C

In a few instances, the Legislature has expressly prohibited or limited insurance for punitive damages; in a few others, it has expressly allowed such insurance. Although all legislative action is relevant in determining public policy, little can be learned from the statutory provisions related to punitive damages.

For reasons never entirely clear, the Legislature has restricted the availability of punitive damages coverage to health care providers, then lifted those restrictions in specific instances. In 1977, as part of the bill adopting the Medical Liability Insurance Improvement Act of Texas, the Legislature provided that professional liability insurance policies issued for physicians and certain other health care providers "in this state", including hospitals and not-for-profit nursing homes,

could not include punitive damages coverage.[49] Since the Act addressed what the Legislature found to be a "medical malpractice insurance crisis",[50] the prohibition may have been intended to reduce insurance premiums.[51] But it has never been clear whether the prohibition applied to insureds "in this state" or only policies issued "in this state", so that punitive damages coverage could be obtained from out-of-state insurers.[52] If the latter, then the effect of the prohibition on insurance costs was diminished. Furthermore, in 1987, 1997, 2001, and 2003, the statute was amended to allow the Board of Insurance, and later the Commissioner, to approve a policy endorsement providing punitive damages coverage first for hospitals, then not-for-profit nursing homes, then for-profit nursing homes, and finally assisted living facilities.[53] These amendments suggest that insurance cost control was never the Legislature's motivation. Indeed, it is difficult to discern in these amendments

---

**49.** Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2054–2056 (adding former TEX. INS. CODE art. 5.15–1, sections 2(2) (defining "health care provider") and 8 (stating "No policy of medical professional Insurance issued or renewed for a health care provider or physician in this state may include coverage for punitive damages that may be assessed against the health care provider.")).

**50.** *Id.* § 1.02(a)(5), at 2039–2040.

**51.** *See* HOUSE STUDY GROUP, BILL ANALYSIS, C.S. H.B. 1048, 65th Leg., R.S., 5 (1977) (committee substitute) ("Exempting punitive damages from malpractice insurance coverage will help hold down premiums.").

**52.** The bill analyses for a 1997 amendment suggested that the prohibition applied only to policies issued in Texas. HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, TEX. H.B. 1170, 75th Leg., R.S., 1–2 (April 4, 1997) ("Currently, [not-for-profit nursing] homes must purchase insurance against punitive damages from out-of-state carriers, because only hospitals are

currently allowed to do so in Texas.... [The amendment] would simply allow these homes to purchase insurance in Texas from a Texas regulated company."); SEN. RESEARCH CTR. [SEN. ECONOMIC DEV. COMM.] BILLANALYSIS, C.S.H.B. 1170, 75th Leg., R.S., 1 (May 6, 1997) ("Currently, the Insurance Code prohibits not-for-profit nursing homes from purchasing punitive damage insurance coverage under medical professional liability insurance from an admitted carrier. Not-for-profit nursing homes may purchase such insurance from non-admitted, out-of-state carriers.").

**53.** Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 7.01, 1987 Tex. Gen. Laws 1, 35–36 (allowing an endorsement for hospitals); Act of May 21, 1997, 75th Leg., R.S., ch. 746, § 1, 1997 Tex. Gen. Laws 2451, 2451 (allowing an endorsement for nonprofit nursing homes); Act of May 27, 2001, 77th Leg., R.S., ch. 1284, § 5.02, 2001 Tex. Gen. Laws 3083, 3085 (allowing an endorsement for for-profit nursing homes); Act of May 16, 2003, 78th Leg., R.S., ch. 141, § 2, 2003 Tex. Gen. Laws 195, 195 (allowing an endorsement for assisted living facilities).

any policy or policies whatsoever. The statute now provides:

(a) Except as provided by Subsection (b), a medical professional liability insurance policy issued to or renewed for a physician or health care provider in this state may not include coverage for exemplary damages that may be assessed against the physician or health care provider.

(b) The commissioner [of insurance] may approve an endorsement form that provides for coverage for exemplary damages for use on a medical professional liability insurance policy issued to:

(1) a hospital; or

(2) a for-profit or not-for-profit nursing home or assisted living facility.[54]

Several times the Legislature has created or modified guaranty funds and excess liability pools, prohibiting them from paying punitive damage claims either entirely or in part.[55] In each instance the Legislature's concern appears to have been for the economic impact on these entities of insurance for punitive damages.

Finally, since 1987 the Legislature has required commercial liability insurers to file closed claim reports including, among much other information, "amounts paid for ... punitive damages".[56] The reports, which are still required,[57] show that punitive damages factor only very slightly into the settlement of commercial liability claims.[58]

From this legislative activity only a few inferences can be drawn. Since 1977, the

---

54. TEX. INS.CODE § 1901.252.

55. *Id.* § 462.210 (excluding from the definition of "covered claims" against insolvent insurers under the Texas Property and Casualty Insurance Guaranty Act "any punitive, exemplary, extracontractual, or bad-faith damages awarded in a court judgment against an insured or insurer"); § 462.302(c) ("The [Texas Property and Casualty Insurance Guaranty Association] is not liable for ... a claim for ... exemplary damages ...."); § 463.204 (stating that the Life, Accident, Health, and Hospital Service Insurance Guaranty Association cannot pay punitive or exemplary damages); § 2203.154 ("The [Medical Liability Insurance Joint Underwriting Association] may not issue or renew a medical liability insurance policy for a physician or health care provider under this chapter that includes coverage for punitive damages assessed against the physician or health care provider."); § 2205.253(b) ("Money in the [Texas Child–Care Facility Liability Fund] may not be used to pay ... (1) punitive damages ...."); § 2207.353(c) ("Money in the [Excess Liability Fund for Counties and Certain Educational Entities] may not be used to pay ... (1) punitive damages ...."); § 2208.252(b) ("Money in the [Texas Public Entity Excess Insurance Fund] may not be used to pay: (1) punitive damages ...."); § 2208.303 ("Excess insurance coverage provided by the [Texas Public Entity Excess Insurance Pool] may

not include coverage for punitive damages."); § 2209.303 ("Liability insurance coverage provided by the [Texas Nonprofit Organizations Liability Pool] may not include coverage for punitive damages."); § 2602.255(4) (excluding "exemplary, extracontractual, or bad faith damages awarded against an insured or title insurance company by a court judgment" from "covered claims" against the Texas Title Insurance Guaranty Association); § 2209.253(b) ("Money in the [Texas Nonprofit Organizations Liability Fund] may not be used to pay: (1) punitive damages ...."); § 2209.303 ("Liability insurance coverage provided by the [Texas Nonprofit Organizations Liability Pool] may not include coverage for punitive damages.").

56. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 1.01, 1987 Tex. Gen. Laws 1, 4.

57. TEX.INS.CODE § 38.154(a)(3)(C)(ix) (for claims over $25,000), § 38.156(3)(B)(iv) (for claims over $10,000 but under $25,000). These reports are analyzed on the Department's website at http://www.tdi.state.tx.us/reports/ report5.html.

58. The 1998 report showed that for over 5,000 commercial liability claim settlements greater than $25,000, a third were influenced by either non-economic damages, exemplary damages, or prejudgment interest, and of the

Legislature seems to have been concerned that liability insurance for health care providers offered by Texas insurers not be made more expensive by coverage of punitive damages. But health care providers may not have been prevented from obtaining insurance covering punitive damages from insurers outside Texas, and assuming such coverage comes at additional expense, it has presumably had an effect on the cost of health care in Texas. Also, since 1987, the Legislature has made various exceptions for hospitals, nursing homes, and assisted living facilities, and it is not clear why, or why there have been no other exceptions. The Legislature has also shown concern that guaranty funds and excess liability pools, entities funded by assessments and therefore of limited means, not be burdened by payments for punitive damages. Again, its concern appears to be economic, even when a pool covers governmental entities whose liability for punitive damages is limited.[59]

Because the Legislature's first enactment limited the availability of punitive damages coverage, it may be tempting to infer that such coverage did not offend public policy before 1977 and does not do so since except in the specific situations the Legislature has identified. But this supposes that the Legislature has taken a comprehensive view of the subject when in fact its actions have been sporadic over three decades, directed to specific, narrow circumstances, and largely unexplained. If the predominant concern is the economic effect of such coverage, as it seems to have been, it is not clear why that concern has been given voice in only a few situations when it speaks to many.

Thus, it is difficult to find an indication of public policy in the legislative limitations

---

total paid on those claims, 9% was attributed to exemplary damages. For over 4,000 settlements between $10,000 and $25,000, 5% were influenced by exemplary damages, and of the total paid on those claims, 6% was attributed to exemplary damages. For cases tried to a verdict, 11% of the amounts awarded were for punitive damages. TEXAS DEP'T OF INS., 1998 TEXAS LIABILITY INSURANCE CLOSED CLAIM REPORT 2, 5–6, 17 (1998).

The influence of exemplary damages on such settlements declined fairly steadily through 2005. The report for that year showed that for 5,440 commercial liability claim settlements greater than $25,000, a fifth were influenced by non-economic damages, exemplary damages, or prejudgment interest, and of the total paid on those claims, 2% was attributed to exemplary damages. For settlements between $10,000 and $25,000, 0.15% were influenced by exemplary damages, and of the total paid on those claims, 2% was for exemplary damages. For cases tried to a verdict, 4% of the amounts awarded were for punitive damages. TEXAS DEP'T OF INS., 2005 TEXAS LIABILITY INSURANCE CLOSED CLAIM REPORT 2, 5–6, 17 (2005).

59. For example, the Texas Tort Claims Act does not waive governmental immunity from punitive damages, TEX. CIV. PRAC. & REM.CODE § 101.024, but the Act does not apply to liability for proprietary functions. The State and its subdivisions, such as counties, do not engage in proprietary junctions, *Bennett v. Brown County Water Improvement Dist. No. One*, 153 Tex. 599, 272 S.W.2d 498 (Tex. 1954), but municipalities do, and when they do: "As a general rule a municipality may not be held liable for exemplary damages; however, if the plaintiff can show that there is intentional, willful, or grossly negligent conduct which shows an entire want of care to his rights and that such conduct can be imputed directly to the governing body of the municipality, exemplary damages may be recovered." *City of Gladewater v. Pike*, 727 S.W.2d 514, 522 (Tex.1987). The Legislature may authorize punitive damages against the government, as it once did in the Whistleblower Act, Act of May 30, 1983, 68th Leg., R.S., ch. 832, § 4, 1983 Tex. Gen. Laws 4751, 4752, before it changed its mind, Act of May 25, 1995, 74th Leg., R.S., ch. 721, § 3, 1995 Tex. Gen. Laws 3812, 3812 (codified at TEX. GOV'T CODE § 554.003(a)). The government is not liable for punitive damages for employment discrimination. TEX. LAB.CODE § 21.2585.

on, and express approvals of, punitive damages coverage.

## D

Insurance in Texas, as in other states, is thoroughly regulated. For the most part, policy forms must be approved by the Commissioner of Insurance, and in some instances the Commissioner is authorized to prescribe the use of standard policy forms.[60] The workers' compensation policy from which the Fifth Circuit's certified question comes is a standard form policy.[61]

The Commissioner's approval of policy forms including and excluding various types of coverage is some reflection of public policy. Standard form personal automobile policies do not state specifically whether punitive damages are covered, and while two courts have concluded that punitive damages are damages for bodily injury covered by automobile policies,[62] that position has been uniformly rejected in the context of uninsured and underinsured motorist coverage [63] and is therefore dubious at best. Standard form homeowners' policies also do not appear to cover punitive damages although the subject is not expressly addressed in the policies. Other policies shave been held to cover punitive damages in the absence of a provision specifically excluding such coverage.[64]

60. *See, e.g.,* Tex. Ins.Code § 2301.003(b) ("This subchapter applies to all lines of the following kinds of insurance written under an insurance policy or contract issued by an insurer authorized to engage in the business of insurance in this state: (1) general liability insurance; (2) residential and commercial property insurance, including farm and ranch insurance and farm and ranch owners insurance; (3) personal and commercial casualty insurance, except as provided by Section 2301.005; (4) medical professional liability insurance; (5) fidelity, guaranty and surety bonds other than criminal court appearance bonds; (6) personal umbrella insurance; (7) personal liability insurance; (8) guaranteed auto protection (GAP) insurance; (9) involuntary unemployment insurance; (10) financial guaranty insurance; (11) inland marine insurance; (12) rain insurance; (13) hail insurance on farm crops; (14) personal and commercial automobile insurance; (15) multi-peril insurance; and (16) identity theft insurance issued under Chapter."); *id.* § 2301.006(a) ("Except as provided by Section 2301.008, an insurer may not deliver or issue for delivery in this state a form for use in writing insurance described by Section 2301.003 unless the form has been filed with and approved by the commissioner."); *id.* § 2301.008 ("The commissioner may adopt standard insurance policy forms, printed endorsement forms, and related forms other than insurance policy forms and printed endorsement forms, that an insurer may use instead of the insurer's own forms in writing insurance subject to this subchapter.").

61. Tex. Ins.Code § 2052.002(a) ("The commissioner shall prescribe standard policy forms and a uniform policy for workers' compensation insurance.").

62. *Dairyland County Mut. Ins. Co. v. Wallgren,* 477 S.W.2d 341, 342 (Tex.Civ.App.-Fort Worth 1972, writ ref'd n.r.e.); *Manriquez v. Mid–Century Ins. Co.,* 779 S.W.2d 482, 484–485 (Tex.App.-El Paso 1989, writ denied), *disapproved in part on other grounds, Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 822–824 (Tex.1997).

63. *Milligan v. State Farm Mut. Auto. Ins. Co.,* 940 S.W.2d 228, 231–232 (Tex.App.-Houston [14th Dist.] 1997, writ denied), *overruling Home Indem. Co. v. Tyler,* 522 S.W.2d 594 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ ref'd, n.r.e.); *State Farm Mut. Auto. Ins. Co. v. Shaffer,* 888 S.W.2d 146 (Tex.App.-Houston [1st Dist.] 1994, writ denied); *Vanderlinden v. USAA Prop. and Cas. Ins. Co.,* 885 S.W.2d 239, 242 (Tex.App.-Texarkana 1994, writ denied); *Government Employees Ins. Co. v. Lichte,* 792 S.W.2d 546, 549 (Tex.App.-El Paso 1990), writ denied, 825 S.W.2d 431 (Tex. 1991) (per curiam).

64. *See, e.g., DaimlerChrysler Ins. Co. v. Apple,* —— S.W.3d ——, 2007 WL 3105899 (Tex. App.-Houston [1st Dist.] 2007) (CGL and umbrella policies) (policies provided coverage for claims for "personal injury," which was defined to oral publication of libelous material, but excluded coverage for publication of ma-

The workers' compensation policy in the case before the Fifth Circuit specifically excluded punitive damages assessed "because of bodily injury to an employee employed in violation of the law" but specifically included punitive damages assessed for the death of an employee caused by the employer's gross negligence or intentional conduct. Although workers' compensation benefits are ordinarily the exclusive remedy for an employee injured on the job,[65] an action for punitive damages for the death of an employee caused by the employer's gross negligence is preserved by Article XVI, § 26 of the Texas Constitution,[66] adopted at a time when, as already explained, punitive damages were thought to have a compensatory function. Also, by making a person who kills another "responsible" to the surviving family, the constitutional provision in essence creates a wrongful death action, which the common law did not allow, only with a heightened standard of proof and limited recovery. In both respects, insurance coverage for punitive damages does not present the same inconsistencies with the purpose and manner of assessing punitive damages that such coverage would otherwise.

Without a complete review of insurance regulation, it is impossible to determine what factors influence the Commissioner of Insurance in deciding whether to approve or disapprove punitive damages coverage. But because of the Commissioner's role in regulating the insurance business in Texas, that decision must be taken into account in considering whether the coverage is against public policy.

**E**

A few cases applying Texas law have considered whether insurance for punitive damages is against public policy. These may be divided into three categories in which the punitive damages to be covered are assessed against (1) someone other than the insured, (2) an individual insured based on his own conduct, and (3) a corporate insured based on the conduct of its employees.

In the first category are cases involving uninsured or underinsured motorist coverage in which the insured seeks to recover

---

terial done by or at the direction of the insured with knowledge of its falsity); *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 181–182, 185–190 (Tex.App.-Fort Worth, 2004, pet. pending) (for-profit nursing home) (insurer agreed to pay "those sums which the insured shall become legally obligated to pay as damages because of bodily injury to any person arising out of the rendering of or failure to render, during the policy period ... professional services" including nursing care); *American Home Assur. v. Safway Steel Prods. Co.*, 743 S.W.2d 693, 701–702 (Tex.App.-Austin 1987, writ denied) (umbrella policy); *Ridgway v. Gulf Life Ins. Co.*, 578 F.2d 1026, 1029 (5th Cir.1978) (commercial vehicle policy).

65. Tex. Lab.Code § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.").

66. Tex. Const. art. XVI, § 26 ("Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide."). The action is correspondingly recognized by the Workers' Compensation Act. Tex. Lab.Code § 408.001(b) ("This section [providing an exclusive remedy for injured employees] does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.").

from his own insurer punitive damages assessed against a third-party tortfeasor. Recent Texas courts have uniformly rejected such recovery as against public policy.[67] In that situation, the burden of the punitive damages would fall entirely on the insurer and its innocent investors and policyholders, not on the tortfeasor, thereby entirely defeating the purpose of such damages. In one case, *State Farm Mutual Automobile Insurance Co. v. Shaffer,* Shaffer was injured in an automobile accident with Torres. The court of appeals held that it was against public policy to require State Farm, Shaffer's insurer, to pay punitive damages assessed against Torres. Citing Chapter 41 as establishing the basis and manner for assessing punitive damages, the court explained:

> Exemplary damages are assessed to punish a wrongdoer and to serve as a deterrent to future wrongdoers. This policy does not support rendering damages against State Farm since neither deterrence of wrongful conduct nor punishment of Torres, the wrongdoer, is achieved by imposing exemplary damages upon Shaffer's insurance carrier for Torres' wrongful act.[68]

In the second category are two cases involving personal automobile insurance. Both concluded that punitive damages coverage is not against public policy. *Dairyland County Mutual Insurance Co. v. Wallgren,* decided in 1972, was the first case to consider whether punitive damages coverage is against Texas public policy.[69] The court concluded that a personal automobile policy's coverage of "damages because of ... bodily injury" included punitive damages and that the coverage could not be against public policy because it had been approved by the state regulatory agency.[70] As already explained, regulatory approval is certainly one factor to consider in determining public policy, although it may not be conclusive. A 1989 decision in *Manriquez v. Mid–Century Insurance Co.* held that a personal automobile policy covered punitive damages but did not discuss whether that was consistent with public policy.[71] Neither case considered whether insurance against punitive damages should be available when the sole purpose of such damages is punishment, as the Legislature has since determined.

In the third category are four cases, two of which involve commercial vehicle insurance. In *Ridgway v. Gulf Life Insurance Co.,* a 1978 diversity-jurisdiction case, the Fifth Circuit summarily affirmed a federal district court's decision that punitive damages coverage is not against Texas public policy.[72] The district court relied entirely on *Dairyland,* discussed above, and *Home Indemnity Co. v. Tyler*[73] as stating Texas law.[74] In *Home Indemnity,* the court held that uninsured motorist coverage of puni-

---

67. *See* sources cited, *supra* note 63.

68. *Shaffer,* 888 S.W.2d at 149 (citations omitted).

69. 477 S.W.2d 341 (Tex.Civ.App.-Fort Worth 1972, writ ref'd n.r.e.).

70. *Id.* at 342–343.

71. 779 S.W.2d 482, 484–485 (Tex.App.-El Paso 1989, writ denied), *disapproved in part on other grounds, Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819 (Tex.1997).

72. 578 F.2d 1026, 1029 (5th Cir.1978).

73. *Home Indemnity Co. v. Tyler,* 522 S.W.2d 594 (Tex. Civ. App.-Houston [14th Dist.] 1975, writ ref'd, n.r.e.), *overruled by Milligan v. State Farm Mut. Auto. Ins. Co.,* 940 S.W.2d 228, 232 (Tex.App.-Houston [14th Dist.] 1997, writ denied).

74. *Ridgway,* 578 F.2d at 1029–1030.

tive damages is not against public policy, but the same court has since overruled that case and followed the other courts that have reached the opposite conclusion.[75] *Ridgway* preceded Chapter 41 by nine years and did not consider whether punitive damages coverage is consistent with the purpose of punishment. In 1998, a federal district court in *Hartford Casualty Insurance Co. v. Powell*, 19 F.Supp.2d 678 (N.D.Tex.1998), another commercial vehicle insurance case, surveyed Texas law since Dairyland and Home *Indemnity* and concluded that *Ridgway's Erie*-guess about Texas law "is clearly wrong when considered in context with the present Texas legal environment."[76] *Powell* made its own *Erie*-guess that in most instances punitive damages coverage contravenes Texas public policy.

The other two cases in the third category involved general liability policies issued to corporate insureds. Both noted that the policy considerations regarding punitive damages coverage are different when the basis for the damages is the conduct of the insured's employees or agents. *American Home Assurance Co. v. Safway Steel Products Co.* was a consolidation of two declaratory judgment actions, one involving an umbrella policy and the other an excess policy.[77] Punitive damages of $750,000 and $1 million had been assessed against the insureds, respectively, in one case for gross negligence in failing to warn of the limitations of a football helmet the insured manufactured, and in the other case for gross negligence in the design and marketing of a scaffold.[78] The court observed that while allowing coverage of punitive damages would shift the burden of the punishment to "innocent" insurance purchasers,[79] thus thwarting the purpose of such damages, disallowing coverage for a large corporation would mean shifting the burden for the misconduct of a few employees to innocent consumers,[80] which is also contrary to the purpose for such damages. In the end, the court said, "[t]he question of how to 'punish' a corporation is a difficult one."[81]

*American Home* was decided in late 1987, shortly after Chapter 41 took effect. It did not refer to that statute and noted specifically that "[i]n Texas, juries are not allowed to consider the defendant's wealth, resources, or insurance coverage when assessing compensatory or punitive damages."[82] It was not until three months later that this Court held for the first that a defendant's net worth is relevant in assessing punitive damages.[83] The only case to consider the current provisions of Chapter 41 in determining public policy regarding punitive damages coverage is *Daimler-Chrysler Insurance Co. v. Apple*.[84] There, a car dealership's inventory control manager claimed that his employer's controller, general manager, and used car sales manager had defamed him. An arbitration panel agreed and assessed punitive damages of $500,000 against the dealer-

---

75. *Milligan*, 940 S.W.2d at 232.

76. 19 F.Supp.2d 678, 696 (N.D.Tex.1998).

77. 743 S.W.2d 693, 695–696 (Tex.App.-Austin 1987, writ denied).

78. *Id.* at 695.

79. *Id.* at 704.

80. *Id.*

81. *Id.*

82. *Id.* (italics omitted).

83. *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex.1988).

84. —— S.W.3d ——, 2007 WL 3105899 (Tex. App.-Houston [1st Dist.] 2007) (cause no. 01–05–01115–CV) (pending on motion for rehearing).

ship, $500,000 against its owner and CEO, and $50,000 each against the three employees, all of whom were determined to be vice-principals.[85] The district court confirmed the award of punitive damages against the dealership and two of the employees, and on appeal, the dealership settled with the plaintiff.[86] The dealership's insurer under both a CGL policy and an umbrella policy refused coverage of the punitive damage awards, arguing in part that such coverage was against public policy.[87] The court rejected the argument in these circumstances but stressed that its decision was a limited one:

> We express no opinion on whether, as a general rule, Texas policy disallows a party from insuring for exemplary damages. Our holding today is limited to the narrow circumstances before us, where a corporation is held liable for conduct by vice-principals; the conduct was done without the participation or knowledge of the CEO, officers or shareholders of the corporation; and the contract at issue covers "all sums" and is an arm's-length transaction between an insurance company and a corporation that distinguishes between conduct done by employees and conduct done by the

corporate entity, its CEO, its shareholders, and its officers. Thus, we cannot conclude that allowing the insurance coverage under these limited circumstances violates public policy to punish the wrongdoer.

Viewing the underlying facts concerning this agreement, we also cannot conclude that this agreement is contrary to the public good. Rather, the agreement here serves the public good because [the dealership], its CEO, its officers, and its shareholders did not commit the wrongful acts and should be allowed to have their insurance policy, for which they paid, indemnify them for the punitive damages, which were assessed against the corporation only due to conduct, of which its CEO, officers, and shareholders were not aware, done by its employees who held management positions. We hold that the agreement does not violate public policy.[88]

Outside the insurance context, it is worth noting that this Court has suggested that a person's pre-injury waiver of another's liability for gross negligence is against public policy while holding that a post-injury waiver is not.[89] And one court of

---

85. *Id.* at —— & n. 4; *see also Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997) (stating that "the general rule in Texas" is set out in RESTATEMENT OF TORTS § 909 (1939): "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act.").

86. *DaimlerChrysler v. Apple,* —— at ——.

87. *Id.*

88. *Id.* at —— (citations omitted).

89. *Memorial Med. Ctr. of E. Tex. v. Keszler,* 943 S.W.2d 433, 435 (Tex.1997) (per curiam) ("The court of appeals held that such a release is against public policy [citing *Smith v. Golden Triangle Raceway,* 708 S.W.2d 574, 576 (Tex.App.-Beaumont 1986, no writ)]. However, the court of appeals failed to distinguish a pre-accident waiver of liability from a post-injury release made in settlement of claims. In *Golden Triangle,* the issue was whether a pre-injury release could effectively dispense with a claim of gross negligence. The court found a pre-injury release of gross negligence invalid as against public policy. [*Golden Triangle,* 708 S.W.2d at 576.] We have never held post-injury releases of gross negligence claims invalid. There is no logic in prohibiting people from settling existing claims. Significantly, such a rule would preclude settlement of many such claims. The

appeals has held that an agreement to indemnify a person for his own gross negligence is not against public policy,[90] an issue on which this Court has expressed no opinion.[91]

In sum, recent Texas courts have uniformly held that uninsured or underinsured motorist coverage of punitive damages is against public policy, but in other contexts they have not had the opportunity, except in *DaimlerChrysler,* to take into account the importance of the purpose and manner of assessing punitive damages set out in Chapter 41. That case particularly, as well as the others, illustrates the important distinctions between punitive damages coverage for the gross negligence of the insured himself, the insured's employees, and third parties.

### F

Finally, though Texas' public policy is its own, it is formed, not in a vacuum, but in awareness of the law of other American jurisdictions. That law is, of course, heavily influenced by the jurisdiction's view of punitive damages. The cases defy easy categorization, but it appears that: 19 states generally permit coverage of punitive damages;[92] 8 states would permit coverage of punitive damages for grossly negligent conduct, but not for more serious conduct;[93] 11 states would permit coverage of punitive damages for vicariously-assessed liability, but not directly-assessed liability;[94] 7 states generally prohibit an insured from indemnifying himself against punitive damages;[95] and the remainder have silent, unclear, or otherwise inapplicable law.[96] States may fall into more than one category.

### III

I return now to the Circuit's question. The case pending before that court involves a workers' compensation policy that expressly provides coverage for punitive damages for the death of an employee caused by the employer-insured's gross negligence. The policy is a standard form prescribed by the Commissioner of Insurance for workers' compensation insurance in Texas. The action, as noted above, was

court of appeals erred in holding that [the plaintiff] could not release his gross negligence claim against [the defendant]." (citations omitted)).

**90.** *Webb v. Lawson–Avila Constr., Inc.,* 911 S.W.2d 457, 461–462 (Tex.App.-San Antonio 1995, writ dism'd w.o.j.) ("Appellants argue that indemnity for one's own gross negligence, in a non-insurance context, is violative of public policy.... [T]here is nothing in the record or in the law which would allow us to ignore [an indemnity provision's] plain meaning. The record reveals nothing other than an arm's length transaction between two business entities, and we must fairly and reasonably interpret the contract.... [Whether the provision is against public policy] is a matter better left to the Legislature or the ruling of our Supreme Court.").

**91.** *Atlantic Richfield Co. v. Petrol. Pers., Inc.,* 768 S.W.2d 724, 726 n. 2 (Tex.1989) ("We do not decide whether indemnity for one's own gross negligence or intentional injury may be contracted for or awarded by Texas courts. This issue is not presented in this [case].").

**92.** Alabama, Alaska, Arizona, Delaware, Georgia, Hawaii, Idaho, Maryland, Mississippi, Montana, New Hampshire, New Mexico, North Carolina, South Carolina, Tennessee, Vermont, Washington, Wisconsin, and Wyoming.

**93.** Arkansas, Kentucky, Iowa, Louisiana, Nevada, Oregon, Virginia, and West Virginia.

**94.** California, Connecticut, Florida, Illinois, Indiana, Kansas, Kentucky, Minnesota, New Jersey, Oklahoma, and Pennsylvania.

**95.** Colorado, New York, North Dakota, Ohio, Rhode Island, South Dakota, and Utah.

**96.** Maine, Massachusetts, Michigan, Missouri, and Nebraska.

preserved in the Texas Constitution at a time when punitive damages were often treated as compensatory, and is in the nature of a wrongful death action with a heightened burden of proof—gross negligence—and limited damages—punitive only. The purpose and manner of assessing punitive damages generally, now reflected in Chapter 41, has evolved apart from the constitutional action. And in many instances, employers will be corporations whose liability will be due to the conduct of other employees. For these reasons, I agree with the Court that the coverage does not contravene Texas public policy.

But the Circuit's question is broader. The following considerations inform its answer in other insurance contexts:

- Contracts must be respected, and the right to contract freely should not be restricted without compelling reasons.
- Punitive damages may be assessed only as punishment and not for any other purpose, and thus they must be directed at the specific conduct of an individual defendant and must be based on his particular circumstances, including his net worth.
- Punitive damages coverage may pose an undesirable cost to insureds and to the public.
- Insurance is highly regulated, and the Commissioner of Insurance must have broad discretion to determine when punitive damages coverage may be offered.

For uninsured and underinsured motorist coverage, the consensus among the courts of appeals is that public policy prohibits extending the coverage to punitive damages. It is one thing for insurers' policyholders to share in the burden of injury caused by an underinsured motorist and quite another to share in his punishment. Penalizing those who obtain the insurance required by law for those who do not simply cannot be justified.

The considerations weigh differently when the insured is a corporation or business that must pay punitive damages for the conduct of one or more employees. Although the conduct is attributable to the business, as it must be for liability for punitive damages, it will often be the case that stockholders, other employees, and even management as a larger group have done little to deserve punishment. Chapter 41 sets out the policy that punitive damages be directed against specific wrongdoing, but when such damages are assessed against an entire business for one employee's wrongdoing, the punishment is at best indirect. While punitive damages are nevertheless imposed, a valid argument can be made that businesses should be permitted to insure against them, so that the burden is shared by others in like situations.

But even if public policy considerations do not preclude punitive damages coverage for the business, they counsel against extending that coverage to the wrongdoer himself. To insure an individual against punitive damages for his own gross negligence entirely defeats the punitive purpose of such damages and reduces the disincentive for misconduct. Even if the insured must pay higher premiums, which is not always the case, the punishment is so diluted that the purpose of punitive damages is seriously impaired. For example, the owner of a truck, aware that its brakes are malfunctioning, may be more likely to continue to use it, despite the grave risk to his employees and others, if his liability for punitive damages is covered by insurance and he perceives that the benefit to his business exceeds the cost of his insurance. In that situation, insurance encourages conduct punitive damages are intended to deter.

Taking into account the policy favoring freedom of contract, I would hold that when Chapter 41's punitive purpose would be significantly impaired, and a defendant's net worth could not be meaningfully incorporated in the assessment, as Chapter 41 requires, insurance against punitive damages would violate Texas public policy unless these considerations are outweighed by other factors, such as expressions of legislative will, or regulatory approval of the coverage, or the attenuation of the burden of liability from the misconduct. In these situations, in my view, there is no formulaic answer to the public policy question. Chapter 41 provides for punishment of a person who knows full well that his conduct poses an extreme risk of harm to others and yet does not care. That, in essence, is gross negligence. The public policy analysis must answer why punitive damages for such egregious behavior should be avoided by insurance.

Justice JOHNSON, concurring in part.

I join the Court's opinion as to parts I, II and IV. However, I consider part III of the opinion to go further than necessary in responding to the certified question presented even in light of Texas Constitution article V, section 3–c. Accordingly, I do not join part III and express neither agreement nor disagreement with its substance.